[Crim. No. 19162. Jan. 24, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO PALACIO CRUZ, Defendant and Appellant.

**COUNSEL**

Sanford Jay Rosen, under appointment by the Supreme Court, Thelton E. Henderson, Robert S. Baker, Kathleen Purcell and Rosen, Remcho & Henderson for Defendant and Appellant.

Paul Halvonik, State Public Defender, and Charles M. Sevilla, Chief Assistant State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**NEWMAN, J.**—Defendant appeals from conviction after a jury trial on three counts of first degree murder. He was found to be sane as to each count and was sentenced to death.

### I. *Facts*

In the very early hours of June 3, 1975, using a length of pipe, defendant crushed the skulls of his wife, a 15-year-old step-grandson, and a 10-year-old step-granddaughter. An eight-year-old step-granddaughter waked while he was attacking the step-grandson and fled from the house, escaping the tragedy. To assure his wife's death defendant loaded a shotgun and fired it into her face. After the killings he removed the 10-year-old's cutoffs and spread vaseline in and around her vagina, but apparently he did not conclude an act of intercourse. He denied molesting her, stating he had attempted intercourse before but she was too small and would not cooperate. He was unable to explain his reasons for removing her clothing and applying the lubricant.

Police were summoned by a call made by the eight-year-old from a neighbor's home. They arrived at approximately 2:30 a.m. and were able to persuade defendant to leave the house at approximately 4 a.m. When he emerged he acknowledged the killings and stated, "[D]o with me what you want. I am ready to pay the penalty." He was handcuffed and placed in the police car while the officers conducted a search of the home. At approximately 5:30 the search was completed and the bodies of the victims removed. At that time he was advised of his *Miranda* rights and taken to Susanville. While being transported he gave a detailed account of the slayings and stated that he killed the grandchildren and his wife because they treated him without respect

and were always picking on him and making derogatory comments about him in the presence of others.

At trial the fact that he had committed the killings was not disputed. His defense at the guilt phase essentially was that he did not have the ability to harbor malice or to premeditate or deliberate because of a diminished capacity due to alcohol and mental illness.

His counsel raises several contentions here, including the following: (1) whether there was substantial evidence of premeditation, deliberation, and malice; and (2) whether the judge erred in refusing to instruct, *sua sponte*, that malice aforethought includes an awareness of the duty to act within the body of laws that regulate society. His appeal also raises the question of the proper insanity test; and because of our intervening decision in *People v. Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318] we consider whether to remand for a new insanity phase trial, using the *Drew* test. He also challenges the constitutionality of the death penalty in effect at the time of the killings. (Stats. 1973, ch. 719, §§ 2, 4, 5, 6, pp. 1297-1300, repealed by Stats. 1977, ch. 316, §§ 4, 6, 8, 10, pp. 1256-1258.) The challenge is valid for the reasons given in *Rockwell v. Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101]. Therefore, though we reject defendant's other contentions and affirm the judgment, we must modify it to provide for a sentence of life imprisonment in accordance with the constitutionally valid provisions of the applicable statute. (*Rockwell, supra,* at p. 445; *People v. Teron* (1979) 23 Cal.3d 103, 119 [151 Cal.Rptr. 633, 588 P.2d 773].)

## II. *Evidence of the specific intent required for first or second degree murder*

Manslaughter is an unlawful killing without malice. (Pen. Code, § 192.) Murder in the second degree is an unlawful killing with malice aforethought (§§ 187 and 189). First degree murder is in addition willful, deliberate, and premeditated—or committed under conditions not relevant here. (§ 189.)

Defendant contends that the evidence was insufficient to prove premeditation, deliberation, and malice in light of the evidence of his diminished capacity. Concerning the sufficiency of evidence to support a finding of the degree of murder *People v. Wolff* (1964) 61 Cal.2d

795, 818-819 [40 Cal.Rptr. 271, 394 P.2d 959] states: "This problem . . . is by no means new to us. In dealing with it we recognize that every relevant and tenable presumption is to be indulged in favor of sustaining the judgment of the trial court; but when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second degree and affirm it as modified."

■ Diminished capacity is a defense to all specific intent crimes. (*People* v. *Wetmore* (1978) 22 Cal.3d 318 [149 Cal.Rptr. 265, 583 P.2d 1308].) ■ As it applies to murder, the defense was explained in *People* v. *Henderson* (1963) 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]: "It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue'. . . . Under the *Wells-Gorshen* rule of diminished responsibility [or 'diminished capacity,' per *People* v. *Anderson* (1965) 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43]] even though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now firmly established in the law of California."

■ Further, "A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease. . . and in such a case his killing. . . is voluntary manslaughter." (*People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911].) See also *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Wells* (1949) 33 Cal.2d 330, 343-357 [202 P.2d 53].

■ *People* v. *Wolff, supra,* 61 Cal.2d at pp. 821-822, set out these guidelines for diminished capacity to deliberate and premeditate: "'The true test is not the duration of the time as much as it is the *extent of the reflection.*' . . . [T]he true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act . . . . ■ Certainly in this case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally

well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with realization of the enormity of the evil, appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached. ▮ We think that our analysis in *Holt* of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender*, fits precisely this case: that the use by the Legislature of 'wilful, deliberate, and premeditated' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill." (Original italics.)

The *Wolff* language has been endorsed repeatedly by this court in diminished-capacity murder cases where premeditation was an issue. (*People* v. *Goedecke* (1967) 65 Cal.2d 850, 856 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 877 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Bassett* (1968) 69 Cal.2d 122, 148 [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 51-52 [73 Cal.Rptr. 533, 447 P.2d 925]; *In re Kemp* (1969) 1 Cal.3d 190, 194-195 [81 Cal.Rptr. 609, 460 P.2d 481]; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 727-728 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 713 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Horn* (1974) 12 Cal.3d 290, 298-299 [115 Cal.Rptr. 516, 524 P.2d 1300].) The words most consistently stressed are "extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act." (*Wolff, supra,* 61 Cal.2d at p. 821; see Comment, *Keeping Wolff from the Door: California's Diminished Capacity Concept* (1972) 60 Cal.L.Rev. 1641.)

▮ As for malice, in a proper case "a jury could conclude that the defendant killed intentionally, with premeditation and deliberation, but did not do so with malice aforethought." (*People* v. *Conley, supra,* 64 Cal.2d at p. 323; and see *People* v. *Gorshen, supra,* 51 Cal.2d 716.) Substantial evidence supporting a finding of premeditation and deliberation does not in every case show that defendant also acted with malice aforethought.

■ *Conley* defined malice as used in the murder statute: "When a defendant "'with a wanton disregard for human life, does an act that involves a high degree of probability that it will result in death,'" he acts with malice aforethought. [Citations.]" (*People v. Conley, supra,* 64 Cal.2d at p. 321.) "If because of mental defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought." (*Id.,* at p. 322.) "The mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim." (*Id.,* at p. 321.)

## A. *Standard of review*

■ Another first degree murder decision, *People v. Bassett, supra,* 69 Cal.2d at page 138, summarized as follows the principles of review for sufficiency of evidence to support the jury determination of the degree of the crime: "First, we must resolve the issue in light of the *whole record*—i.e., the entire picture of the defendant put before the jury— and may not limit our appraisal to isolated bits of evidence selected by the respondent. [See also *People v. Holt* (1944) 25 Cal.2d 59, 69 (153 P.2d 21).] Second, we must judge whether the evidence of each of the essential elements constituting the higher degree of the crime is *substantial*; it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for 'Not every surface conflict of evidence remains substantial in the light of other facts'. (*People v. Holt, supra,* at p. 70 of 25 Cal.2d.)" (Original italics.)

The Attorney General urges us to focus on defendant's conduct and declarations within a short time before and after the killings as evidencing the requisite intent for first degree murder. While such evidence is relevant to prove mental condition at the time of the offense (*People v. Wolff, supra,* 61 Cal.2d at p. 805), by no means is it the only relevant evidence here. "[T]he jury was not free to isolate such specifically mentioned items of evidence from all the other related facts and circumstances." (*People v. Holt, supra,* 25 Cal.2d at p. 69.) Defendant argues that the "other related facts and circumstances" in his case concern his mental illness, as indicated especially by psychiatric testimony about his capacity to entertain the requisite intent for first or second degree murder. If we find indisputably established facts as to lack of intent that, as a matter of law, overcome inconsistent inferences drawn from other evidence, we must hold that intent is not proved. But if we

find merely a substantial conflict in the evidence, the jury's determination of the degree is controlling. (*Holt, supra,* at pp. 69-70; *Bassett, supra,* 69 Cal.2d 122 at pp. 137-138.)

## B. *The evidence*

The facts about defendant's behavior around the time of the killings, as set out above, are undisputed. They meet the standards of *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942] for the kind of evidence on which a jury may base a finding of premeditation and deliberation. Defendant's pent-up resentment toward his victims establishes the prior relationship from which the jury reasonably could infer a motive for the killings. His actions prior to the killings (sneaking out to get the pipe, securing and loading the shotgun) can be characterized as "planning" activity. Finally, the killings by blows to only the head and by a shotgun blast in his wife's face permit the jury to infer that the manner of killing was so particular and exacting that defendant must have killed intentionally according to a preconceived design and for a reason. Thus all three types of evidence specified in *Anderson* are present here to support a finding of premeditation and deliberation. And the objective circumstantial evidence is sufficient also to support a finding of malice.

That evidence cannot, though, be isolated from other related facts. The additional facts in this case concern mental illness and intoxication. We must decide whether the jury's verdict can be upheld in the light of the evidence on those facts.

As for intoxication, the record supports the conclusion that it was not proved. Defendant began drinking from a one-third full, half-gallon bottle of bourbon in the afternoon before the killings. At 7:40 a.m. the following day a postarrest test revealed a 0.14 blood alcohol content. The defense attempted to calculate alcohol content at the time of the killings (about 2 a.m.), but the conclusion is faulty because the record does not indicate whether defendant emptied the bottle before the killings or after the killings before the police arrived. Clearly, intoxication was not "indisputably established".

As for the mental illness, the evidence included defendant's mental history and three psychiatrists' testimony. The history shows that in 1951, at age 21, he had a breakdown while serving with the air force in

Japan. He was hospitalized for about a year at Letterman Hospital, where he had electroconvulsive and insulin-shock treatments. After discharge he lived with his family in southern California. In 1965 he was arrested and charged with shooting a hitchhiker and was sent to Mendocino State Hospital for about two years. There he had delusions and hallucinations and was described as markedly depressed and withdrawn; he received electroconvulsive treatments and medication. In 1958, living alone in the desert near Barstow, he was arrested for molesting a neighbor's 12-year-old daughter and was admitted to Patton State Hospital. There he was diagnosed schizophrenic and described as inverted, depressed, and hallucinated. He was transferred to Brentwood Veterans Administration Hospital, where he showed gradual improvement. In 1961 he was placed on "family home care" and outpatient status until discharge in 1965. In 1963 he married a woman 30 years his senior and moved to a desert ranch she owned, where he worked and improved the property. In 1966 he moved to Lassen County and bought land in the desert where he lived for about a year until his wife joined him. In Lassen he constructed a record of drunkenness and drunk driving consistent with the drinking problems he had had for years.

He and his wife lived on four pensions. One of his was a disability allowance from the Veterans Administration (VA), which had diagnosed him as a chronic schizophrenic and rated him 100 percent disabled. Shortly after moving to Lassen he had a follow-up examination in Reno, and the diagnosis and 100 percent rating were continued. The examining psychiatrist noted that he was "tenuously adjusted" (that is, marginally independent on his farm), but gave him a "poor prognosis."

Defendant's mental-health history between the 1966 VA disability rating for pension purposes and the 1975 killings is sparse. Four years before the killings he stopped taking Mellaril, the medication he had used since leaving the VA hospital in 1961.

Some months prior to the killings, he developed family and financial problems. A year before the incident his wife, from whom he was occasionally separated for long periods, brought her three school-age grandchildren to Lassen. He wanted them sent back to their parents because of the expense. He had to borrow money, had more friction with his wife, and drank heavily. The two of them talked of dissolution. He stated that for three months before the killings she had refused sexual

contact and once had threatened to kill him when he was drunk, and he had invited her to do so. About a month before the killings he tried to burn down the house while she was gone, so as to keep his possessions from her if she forced him to leave or left herself. As for the grandchildren, he gave them attention and affection, taking them on fishing trips and other activities; but he also felt anger because they made fun of him and were costing too much money. There is some indication that he sexually molested the girls. A few months before the killings he unsuccessfully sought help from the district attorney in sending the children back to their parents. He also sought help from the local mental health agency, particularly with respect to his drinking. During the period of family and financial tension he continued competently to manage his day-to-day affairs.

While the psychiatric witnesses did not dispute that history, they disagreed on its meaning in terms of defendant's mental capacity on the night of the killings. One defense psychiatrist stated that defendant's capacity to maturely and meaningfully reflect on the gravity of his act was diminished; that he had the capacity to deliberate, though "probably in a very weak or attenuated fashion"; and that he had the capacity to, and did, harbor malice at the time of the killings. The other defense psychiatrist testified that defendant could not premeditate or maturely and meaningfully reflect on the gravity of his act; that his capacity to deliberate was "modified considerably"; and that though he did harbor malice his capacity to do so was impaired.

To rebut that evidence the prosecution presented its own psychiatric witness, who testified that defendant did have the capacity, "within normal standards," to premeditate, deliberate, maturely and meaningfully reflect on the gravity of his acts, and harbor malice.

The three psychiatrists phrased their conflicting conclusions in similar words. Defense counsel argues that the testimony of the prosecution psychiatrist has no value and could not successfully rebut the testimony of the defense psychiatrists. As this court has stated before, the value of a psychiatric expert's conclusions on diminished capacity lies in the material on which they are based and the reasoning by which they are reached. (*People* v. *Coogler* (1969) 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Bassett, supra,* 69 Cal.2d at p. 141.) We must look beyond the "ritual formula" and "determine the substantiality of the proof which that testimony purported to represent." (*Bassett, supra,* at pp. 140-141.)

The challenges to the material used by the prosecution psychiatrist are three: (1) he administered no psychological tests; (2) he ignored defendant's long history of mental illness; and (3) he did not consider the extent of defendant's drunkenness the night of the killings. None of those challenges reveals Dr. Shoor's testimony to be insubstantial.

■ No rule requires that an expert psychiatric opinion be based on particular tests. (See Evid. Code, § 801, subd. (b).) Here the two defense psychiatrists did use standard tests. ■ Dr. Shoor relied instead on a two and one-half hour interview with the defendant and on an examination of police and medical records and autopsy reports. He explained to the jury why he did not use psychological tests: He believed, based on years of experience, that they were not reliable. Contrary to defense counsel's assertion, this case is distinguishable from *Bassett,* where the court held insubstantial the testimony of psychiatrists who had never examined the defendant. (*Bassett, supra,* 69 Cal.2d at pp. 141-143.)

Next, the record shows that Dr. Shoor did not ignore defendant's history of mental illness. Rather, he discussed the history at length and repeatedly referred to it in his testimony. He noted, though, that defendant had had no record of mental illness for several years before the killings and he stated his belief that defendant had been cured for about 12 years. He presented the jury with a long description and explanation of schizophrenia and of the facts that led him to conclude that defendant no longer suffered from that disease and therefore had no diminished capacity. ■ "The *sine qua non* of . . . a showing [of diminished capacity not due to intoxication] is that there be evidence of either mental illness or mental defect." (*People* v. *Berry* (1976) 18 Cal.3d 509, 517 [134 Cal.Rptr. 415, 556 P.2d 777].)

It is clear also that Dr. Shoor was aware that defendant had been drinking the night of the killings. However, as we have mentioned above, it was not possible to determine the extent of defendant's drunkenness at the time of the killings; and a conclusion based on speculation was not essential to render his testimony on defendant's mental state substantial.

As for Dr. Shoor's reasoning, defense counsel argues: (1) he did not separately analyze the three killings; (2) he did not understand the legal meaning of "maturely and meaningfully reflect" and "malice"; and (3)

he did not evaluate the extent of defendant's capacity to maturely and meaningfully reflect.

■ The record shows that Dr. Shoor did discuss all three killings. He referred separately to defendant's attitude toward his wife and to his attitude toward the step-grandchildren. He recognized the differences in the manner and timing of the killings. His testimony is not insubstantial merely because he did not share defense counsel's view that the motive for killing the children was less than the motive for killing the wife and that, therefore, a clear lack of premeditation is shown as to the children.

As for Dr. Shoor's understanding of the legal standards involved, he was not asked to define the terms. Defense counsel complains that Dr. Shoor equated the ability for systematic, result-directed activity with the capacity for mature and meaningful reflection. He did state that defendant could maturely and meaningfully reflect because he carried out "a complicated series of steps which require a great deal of concentration." But he also testified that he reached his conclusion about mature and meaningful reflection because defendant was able "to think things through . . . to know what he was about, what it involved," "to think beforehand what he was going to do" and to "consider courses of action open to him." Those statements certainly are relevant to the *Wolff* standard of "understanding, reflection upon [the act] and its consequences." (*Goedecke, supra,* 65 Cal.2d at pp. 857-858, and *Nicolaus, supra,* 65 Cal.2d at pp. 877-878, relying on *Wolff, supra,* 61 Cal.2d at p. 822.) Dr. Shoor did not include in his testimony certain other words, such as "realization of the enormity of the evil" or "turpitude of the offender" (*Goedecke, supra,* at p. 858, *Nicolaus, supra,* at p. 878, relying on *Wolff, supra,* at p. 822), but his testimony did provide sufficient bases for the jury to come to its own conclusions on those matters. "There is no magic in the particular words emphasized in *Goedecke* and *Nicolaus.*" *(Bassett, supra,* 69 Cal.2d at p. 140.) ■ The substantiality of expert opinion is not merely a matter of semantics. Further, the ultimate conclusion on diminished capacity is for the jury to make and is not an essential element of expert opinion. "[S]trictly speaking, a psychiatrist is not an 'expert' at all when it comes to determining whether the defendant is *legally* responsible under the terms of the California rule." (Original italics.) (*People* v. *Wolff, supra,* 61 Cal.2d at p. 811.)

■ As for malice, Dr. Shoor and one of the defense psychiatrists testified that defendant had no diminished capacity in that regard; but

neither of them defined malice. The other defense psychiatrist did find diminished capacity to harbor malice, defining it as "bad feelings toward someone else; wanting to do them harm." But the mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim. (*Conley, supra,* 64 Cal.2d at p. 321.) Rather, a defendant acts with malice when he "with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*Ibid.*) That the defendant here could harbor such a state of mind is amply supported by Dr. Shoor's testimony (e.g., "he was able to get some notion if he did these acts these people would be dead and not part of his life anymore"; the manner of killing "demonstrates his mental capacity to, in order to be sure, he obviously had in mind something he had to do in killing her so she wouldn't be alive.").

Defense counsel relies on the statement in *Conley* that malice includes "[a]n awareness of the obligation to act within the general body of laws regulating society" (*id.* at p. 322), and he argues that the prosecution's psychiatric evidence was insufficient to rebut the evidence of defendant's diminished capacity to comprehend that duty. We note that neither side's psychiatric testimony discussed defendant's state of mind in terms of the *Conley* definition of malice. Indeed there was no defense evidence, psychiatric or other, to indicate that defendant had a diminished capacity to comprehend his duty to govern his actions in accordance with the law.[1] Thus Dr. Shoor's failure to discuss the point does not render his testimony on malice insubstantial.

There is no merit in defense counsel's final challenge to the substantiality of Dr. Shoor's testimony, that he did not inquire into the extent of defendant's capacity to maturely and meaningfully reflect. (*People* v. *Nicolaus, supra,* 65 Cal.2d at p. 878; *People* v. *Wolff, supra,* 61 Cal.2d at p. 821.) Contrary to counsel's contention, Dr. Shoor did not merely parrot the law's formula for premeditation. He discussed at length his diagnosis of defendant as not schizophrenic. He explained that he found defendant to be mentally disturbed, sensitive, and burdened by many problems, worries, and frustrations. But in spite of that emotional disturbance, he found no mental disease affecting defendant's mental capacity to entertain the requisite mental states. The record shows

---

[1] We note that the only evidence on this matter was defendant's statement immediately after arrest: "I know I must die for what I have done because it was wrong....I am ready to pay the penalty."

that Dr. Shoor's discussion was far more detailed and much more extensively reasoned than a mere echoing of judicial formulas.

In sum, Dr. Shoor's testimony was substantial evidence in support of the verdict. It had a stated factual foundation and explicit reasoning. (*People* v. *Bassett, supra,* 69 Cal.2d at pp. 141-148.) It clearly provided a sufficient basis for the jury to find no diminished capacity, particularly in light of other evidence that also supported the verdict: the circumstances of the killings, defendant's testimony at trial, and the absence of any recent history of mental illness. Defendant's evidence did not indisputably establish any facts to the contrary, and therefore the jury's determination is controlling. (*People* v. *Holt, supra,* 25 Cal.2d at pp. 69-70.) ■■■ While individually we might disagree with the verdict, it is not our function to reweigh evidence when substantial testimony supports the conclusion of the triers of fact. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].) "'The appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.'" (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321], quoting *People* v. *Bassett, supra,* 69 Cal.2d at p. 139.)

### III. *Insanity*

■■■ We next consider whether it is reasonably probable that the jury would have found defendant insane if the case had been tried using the American Law Institute test: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *People* v. *Drew* (1978) 22 Cal.3d 333, 345, 348 [149 Cal.Rptr. 275, 583 P.2d 1318].[2]

As we noted in *People* v. *Wetmore, supra,* 22 Cal.3d at pages 330-331, the defense of diminished capacity as defined in *Gorshen,*[3]

---

[2]There is no dispute over the sanity verdict under the M'Naughton test. At the sanity trial the defense, which had the burden of proof, offered no evidence other than defendant's own testimony; one psychiatrist who had testified for the defense on diminished capacity testified for the prosecution at the insanity phase that defendant was sane.

[3]"[W]hether he was compelled to do this because of some mental condition...." (*People* v. *Gorshen, supra,* 51 Cal.2d at p. 725.) "Competent testimony to the effect the act of killing resulted from an irresistible impulse due to mental disease is relevant evidence bearing on the issues of intent to kill and malice aforethought." (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 686 [105 Cal.Rptr. 792, 504 P.2d 1256].)

*Wolff,*[4] and *Conley*[5] is very close to that of insanity as defined by the A.L.I. test,[6] though the tactics and results of successful use of the two defenses are different. (*Wetmore, supra,* at pp. 328-330; see Comment, *People v. Drew: California Adopts the ALI Insanity Test* (1979) 67 Cal.L.Rev. 706, at p. 721, fn. 71.) That situation led us to urge legislative reconsideration of the statutes providing for a bifurcated trial, and we repeat that suggestion here. (*Wetmore, supra,* 22 Cal.3d at p. 331; cf. *People v. McDowell* (1968) 69 Cal.2d 737, at pp. 747-748, fn. 4 [73 Cal.Rptr. 1, 447 P.2d 97]; *Estate of Ladd* (1979) 91 Cal.App.3d 219, 226-227 [153 Cal.Rptr. 888]; Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal.L.Rev. 805, 821.)

■ Yet in this case we do not face the problem of a duplication of evidence at another insanity phase trial because the jury completely rejected the diminished capacity defense by returning a verdict of first degree murder. It disbelieved the considerable evidence offered to show that defendant, to at least a limited extent, was out of touch with reality, did not appreciate what he was doing, or could not control his actions.[7] In doing so, the jury necessarily rejected the evidence that might support a verdict that defendant not only had a diminished capacity but was legally insane under either clause of the A.L.I. test. There was no miscarriage of justice. (Cal. Const., art. VI, § 13.)

## IV. *Sua sponte instruction on Conley Definition of Malice Aforethought*

■ Defendant asserts that the trial court erred in failing to instruct *sua sponte* that malice aforethought includes "an awareness of the obli-

---

[4]"[T]he true test [of premeditation and deliberation] must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act." (*People v. Wolff, supra,* 61 Cal.2d at p. 821.)

[5]"If because of mental defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought." (*People v. Conley, supra,* 64 Cal.2d at p. 322.)

[6]See also *People v. Smith* (1973) 33 Cal.App.3d 51, 74-75 [108 Cal.Rptr. 698] pointing out that the diminished capacity defense also overlapped extensively with the M'Naughton test in some cases.

[7]Though we have not discussed it above, considerable evidence as to irresistible impulse was presented by defendant on the issue of diminished capacity and was rejected by the jury.

gation to act within the general body of laws regulating society."[8] (*People* v. *Conley, supra,* 64 Cal.2d at p. 322.) Failure to give a requested instruction based on *Conley* has been held to be reversible error where there is evidence deserving of consideration that defendant lacked an awareness of that duty. (*People* v. *Poddar* (1974) 10 Cal.3d 750, at pp. 760-761 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Fusselman* (1975) 46 Cal.App.3d 289, 301 [120 Cal.Rptr. 282].)

Defendant here did not request an instruction, but he argues on appeal that the court had a duty to give it on its own motion. We have already noted the absence of evidence on the *Conley* aspect of the diminished capacity defense. (*Ante,* at p. 250.) Without relevant evidence it is not reasonably probable that a result more favorable to defendant would have been reached had the instruction been given; and error, if any, was not prejudicial. (Cal. Const. art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, at p. 836.)

## V. *Admission of photographs of the victims*

■ Over a defense objection the trial court admitted three black-and-white photos of the victims' bodies before autopsy, showing the damage to each one's head. Defendant argues they are gruesome and lacking in probative value.

Admission of photos of victims lies within the discretion of the trial court unless their probative value is clearly outweighed by their prejudicial effect. (Evid. Code, § 352; *People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594].) The photos here were relevant to show the circumstances of the crime and as circumstantial evidence of malice. (*Milan, supra,* at p. 194; *Murphy, supra,* at p. 365.) Defendant disputes that conclusion, pointing out that the circumstances of the killings were admitted. Those admissions do not show, however, that the blows were to the heads rather than random blows to the bodies, a matter relevant to malice. As the probative value

---

[8]The trial court did give several other instructions on malice, including the statutory definition of express malice (Pen. Code, § 188) and the following: "The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. 'Aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act." It also instructed on second degree murder, manslaughter, voluntary manslaughter, and absence of malice due to diminished capacity.

is not clearly outweighed by the prejudicial effect, we cannot consider admission of the photos to be an abuse of discretion.

## VI. *Venue and jury voir dire*

Defendant was tried in Lassen County, a rural community with a population slightly under 15,000. The killings received newspaper and radio coverage in the county.

Defendant's trial counsel did not move for a change of venue or raise any issue about jury bias. ██ "'A defendant may not claim for the first time on appeal that he was deprived of a fair trial before an unbiased jury because of newspaper publicity where with full knowledge of the publicity he made no objection and failed to move for a change of venue.'" (*People v. Hillery* (1974) 10 Cal.3d 897, 899-900 [112 Cal.Rptr. 524, 519 P.2d 572], quoting *People v. Walker* (1967) 247 Cal.App.2d 554, 563 [55 Cal.Rptr. 726].) Nothing in the record indicates that counsel's action was due to incompetence. Contrary to defense counsel's contention on appeal, the jury voir dire by both the trial judge and counsel was extensive. It is likely that defendant's trial counsel was satisfied that the jury would give his client a fair trial. Under those circumstances, the trial court fully discharged its duty to assure selection of a fair and unbiased jury.

## VII. *Prosecutorial misconduct*

██ Defendant alleges instances of prosecutorial misconduct. Specifically, he complains of the prosecutor's: (1) cross-examining defendant as to alleged statements about Juan Corona; (2) arguing to the jury in closing that there was not enough evidence of diminished capacity to "turn loose" defendant; (3) telling the jury that malice is shown by intent to kill; (4) arguing facts not in evidence during cross-examination of a psychiatrist; (5) asking a psychiatrist, during cross-examination, about "people [who] kidnap other people and strap dynamite to them"; (6) referring to the presence in the courtroom of the dead children's mother; (7) telling the jury that the diminished capacity defense requires 51 percent diminished mental capacity; (8) referring to a criminalist's testimony as stating that most people are not drunk at a .25 blood alcohol level whereas the witness had said not everybody at that level is "falling down drunk."

Defense counsel at trial did not object to most of the complained of acts or request jury admonitions concerning them; as to others he objected but did not request admonitions. Generally both such objection and request are required before allegations of misconduct will be considered on appeal, unless the act or remark is of such a character that a harmful result cannot be cured by any timely admonition. (*People* v. *Hampton* (1956) 47 Cal.2d 239, 240-241 [302 P.2d 300]; *People* v. *Kirkes* (1952) 39 Cal.2d 719, 726 [249 P.2d 1]; *People* v. *West* (1932) 215 Cal. 87, 97-98 [8 P.2d 463].)

On appeal, as to most of the instances of alleged misconduct, defense counsel makes no attempt to argue that the exception to that general rule applies. As to the other alleged misconduct, we think that an admonition would have been sufficient to cure any harmful effect.

## VIII. *Adequacy of counsel*

Counsel on appeal alleges numerous failures of trial counsel to provide defendant with his constitutionally guaranteed, effective assistance of counsel. He includes matters we have dealt with above: (1) no motion for change of venue; (2) no attempt to remove, for cause, prospective jurors with prior knowledge of the case; (3) no request for an instruction limiting the purposes for which the jury could view the pre-autopsy photos; (4) no request for an instruction on the *Conley* aspect of malice; (5) no objection to intrusion of the name Juan Corona; (6) no objection to several statements by the prosecutor in closing argument. He also charges: (7) failure to produce material testimony on diminished capacity at the guilt phase as well as at the insanity phase; (8) failure to tutor the two defense psychiatrists on the meaning of legal psychiatric terms to enable them to give more favorable testimony; (9) failure to get a third psychiatrist to testify; (10) failure to move to suppress defendant's admissions made after arrest.

Our examination of the record convinces us that trial counsel acted "in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People* v. *Frierson* (1979) 25 Cal.3d 142, 160 [158 Cal.Rptr. 281, 599 P.2d 587].) Certainly defendant does not demonstrate that failure to undertake any act mentioned amounts to withdrawing a potentially meritorious defense. (*Ibid.*) Many omissions, such as failure to object at closing arguments, may have been tactical; and, except in rare cases, an appellate court should not attempt to

second-guess trial counsel as to tactics. (*People* v. *Brooks* (1966) 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383].)

## IX. *Conclusion*

The judgment, insofar as it provides for the penalty of death, is modified to life imprisonment, and as modified, is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Manuel, J., concurred.

Appellant's petition for a rehearing was denied February 20, 1980.