Filed 11/7/23   P. v. Gaspar CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JUAN CARLOS GASPAR,<br><br>        Defendant and Appellant. | B322428<br><br>(Los Angeles County<br>Super. Ct. No. TA151831) |

———————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Tammy Ryu, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General for Plaintiff and Respondent.

———————————

Juan Carlos Gaspar appeals from a judgment that sentences him to 25 years to life in state prison for first degree murder. Gaspar contends there was insufficient evidence the murder was willful, deliberate, or premeditated. He also contends the trial court's imperfect self-defense instruction was deficient. We affirm.

## FACTS

### 1. The Crime

On April 9, 2020, just before 7:00 p.m., Juan Gonzalez was exiting the Home Depot parking lot in Carson with his wife, Luz Gonzalez, when Luz drew his attention to a man "just stomping and kicking" something on the ground.[1] Juan turned back into the parking lot to "see what was going on." When the Gonzalezes realized that it was a person lying on the ground, Luz urged Juan to help the victim. At trial, the Gonzalezes identified Gaspar as the perpetrator.

Juan stopped their car approximately 20 or 30 feet away and observed Gaspar continue to kick the victim in the head. The victim lay on the ground, unmoving, with a bicycle between his legs. Juan approached to within seven feet of Gaspar and said, "Stop kicking him. You are going to kill him." Gaspar responded, "Fuck it. I'll kill him." Gaspar then rifled through the victim's backpack but did not take it from him and resumed kicking the victim in the head. After Juan told him to stop a second time, Gaspar asked if Juan "wanted to get down," meaning fight. Juan said, "Hey I'm not on the ground. Let's do it." But as Juan walked closer, Gaspar backed away to a nearby bus stop, where he remained until the police arrived.

---

[1] For ease of reference, we refer to the Gonzalezes by their first names as necessary. No disrespect is intended.

In the meantime, Luz called 911.  The Gonzalezes remained on the scene until the police arrived and arrested Gaspar at the bus stop.  After several weeks in the hospital, the victim died.

Gaspar was charged with one count of murder in violation of Penal Code section 187, subdivision (a).

## 2.    *The Trial*

The prosecution presented testimony from the Gonzalezes, the responding officers, and the medical examiner who conducted the victim's autopsy.  The medical examiner testified the cause of death was blunt force trauma to the head.  Although the victim had had a prior neurosurgical procedure to the left side of his head that may have made him more susceptible to head injuries, the medical examiner was of the opinion that the prior injury did not contribute to his death.  Surveillance video of the Home Depot parking lot corroborated the Gonzalezes' description of the sequence of events.  The original video and an enhanced version (i.e., zoomed in to magnify the images) was shown to the jury with the investigating officer narrating the events in the video.  Although grainy, the video depicts a person riding a bicycle in the parking lot and stopping to speak to another person.  There is then an altercation between the two figures in the video; the figure on the bicycle falls.  The other person walks away from the cyclist, who is now on the ground, and returns at least twice to continue the altercation.  A third person, presumably Juan Gonzalez, arrives, stops and speaks to them, and the person who is upright walks to the nearby street.  The video ends with the arrival of a police cruiser.

Gaspar testified on his own behalf.  He did not deny the assault but asserted he acted in self-defense.  He explained the

3

victim was on a bicycle and approached him as he was waiting for the bus. The victim said something about "Marlotta and a Leen [sic]," which Gaspar did not understand. The victim also said he had a gun and told Gaspar to give him his belongings. Gaspar did not see a gun but believed it was in the victim's backpack. Gaspar hit the victim in the face and tried to pull the victim's backpack off him. At some point during their struggle, Gaspar fell to the ground. He immediately got back up and began to kick the victim, still fearing for his life.

Gaspar initially believed Juan "was with" the victim because he approached Gaspar from the back. Gaspar explained that was why he challenged Juan to a fight. Gaspar denied telling Juan, "Fuck it. I'll kill him." He testified he instead told Juan in Spanish that the victim had a gun. Gaspar also claimed he told the responding officer that the victim had a gun.

On rebuttal, the prosecution presented testimony from two officers on the scene who interacted with Gaspar. Neither recalled Gaspar telling them about a gun or a robbery. Gaspar later told a detective through a Spanish-speaking officer at the police station that he was angry because the victim had been making fun of him for "too long" about a person named Sharleen but Gaspar did not know a Sharleen. During this interview, Gaspar mentioned that he believed the victim had a gun in his backpack but admitted the victim never reached into his backpack and Gaspar never saw a gun. Nor did Gaspar say the victim threatened him or tried to rob him. No weapons were found on either Gaspar or the victim.

The jury found Gaspar guilty of murder in the first degree. The trial court sentenced him to 25 years to life. The court further ordered victim restitution in the amount of $7,472.04 to

4

the California Victim Compensation Board as reimbursement for the victim's funeral expenses along with other fines and fees. Gaspar timely appealed.

## *DISCUSSION*

### *1. Substantial Evidence Supports the Jury's First Degree Murder Verdict*

Gaspar contends there was insufficient evidence to support a first degree murder conviction and argues for a reduction to second degree murder. We conclude the record reflects substantial evidence of a willful, deliberate, and premeditated killing.

### A. Standard of Review and Legal Principles

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court ' " 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is first degree murder. (*Id.*, § 189, subd. (a).) " ' "An intentional killing is

5

premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).) "[P]remeditation and deliberation is not synonymous with malice aforethought . . . it requires 'substantially more reflection.' [Citation.] Clearly, there must be some evidence that the defendant actually engaged in such reflection, and not merely had the time to do so." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270.)

The Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 identified three categories of evidence as "pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125, citing to *Anderson,* at pp. 26–27.) The *Anderson* court observed that first degree murder convictions may be upheld when there is "extremely strong" evidence of planning or there is evidence of motive in conjunction with planning or manner of killing. (*Anderson*, at p. 27.)

In the years since *Anderson*, the Supreme Court has " 'emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 324.) *Anderson* provides "a framework to aid in appellate review," but it does not "define the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Perez, supra*, 2 Cal.4th at p. 1125.)

6

## B.   Analysis

Gaspar argues there is no evidence of planning, manner of killing, or motive.  The record demonstrates otherwise.

As to planning, Gaspar contends the evidence shows his encounter with the victim was unforeseen:  they simply happened upon one another in the Home Depot parking lot; Gaspar was unarmed; the assault came suddenly; and Gaspar did not know the victim beforehand.

While this is one interpretation of the evidence, it is one rejected by the jury.  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  Here, Gaspar had time to engage in planning activity during the altercation.  The surveillance video showed Gaspar walked away from the victim at least twice during the altercation.  Juan Gonzalez testified that he told Gaspar that Gaspar would kill the victim, to which the latter replied, "Fuck it.  I'll kill him."  Gaspar stopped his attack long enough to rummage through the victim's backpack, but shortly resumed kicking him in the head.

Given these circumstances, the jury could reasonably conclude Gaspar "had ample opportunity to consider the deadly consequences of his actions" and nevertheless formed the plan to kill during the altercation.  (*People v. Stitely* (2005) 35 Cal.4th 514, 544; see also *People v. Streeter* (2012) 54 Cal.4th 205, 244 [that defendant's acts occurred "in stages" demonstrated premeditation and deliberation].)  As to planning, courts have found that planning activity can happen during an altercation itself and *"over a short period of time . . . ."* (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 13; *People v. Brady* (2010) 50 Cal.4th

547, 563 ["The lack of evidence of extensive planning does not negate a finding of premeditation"].)

As to motive, Gaspar argues there was no evidence of motive for the attack other than his claim of self-defense. Yet, Gaspar admitted to the detective at the police station that he was angry because "they've been making fun of him for too long" about Sharleen, a woman he did not know.[2] " 'Anger at the way the victim talked to [the defendant] . . . may be sufficient' " to demonstrate motive. (*People v. Jackson* (1989) 49 Cal.3d 1170, 1200; see *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up resentment toward his victim [ ] establishes the prior relationship from which the jury reasonably could infer a motive for the killing[ ]."].)

As to the manner of killing, Gaspar argues, without evidentiary support, that a reasonable person would not have expected sustained "stomping [on] and kicking" at the victim's head would result in death. According to Gaspar, the victim would not have died but for his prior head injury. On the contrary, the medical examiner testified she examined the victim's entire body and the only injuries he sustained were to his head, leading to his death from blunt force trauma. She also

---

[2] In his reply brief, Gaspar argues his conviction should be reduced to second degree murder based on a theory of provocation from the victim's teasing. Gaspar has forfeited this argument, having raised it for the first time in his reply brief. (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 514 fn. 3.) In any event, the jury was instructed on provocation under CALCRIM No. 522 and rejected this theory by finding Gaspar guilty of first degree murder. To the extent Gaspar contends the jury's finding was not supported by the evidence, we have addressed the sufficiency of the evidence in the text.

rejected the notion that the victim's previous head injury contributed to his cause of death. That Gaspar targeted a vulnerable and vital part of the victim's body supports a finding of premeditation and deliberation. (*People v. Cruz*, *supra*, 26 Cal.3d at p. 245 ["the killings by blows to only the head and by a shotgun blast in his wife's face permit the jury to infer that the manner of killing was so particular and exacting that defendant must have killed intentionally according to a preconceived design"]; see *People v. Lasko* (2000) 23 Cal.4th 101, 112 [the evidence "strongly" suggested an intent to kill as well as premeditation where the defendant hit his victim in the head with a baseball bat using "extreme force"].)

## 2. *The Trial Court Properly Instructed the Jury on Imperfect Self-Defense*

Gaspar additionally contends the trial court erred when it failed to instruct the jury on its own motion that imperfect self-defense applied if a defendant has an unreasonable belief in the need to defend against a robbery. We conclude the trial court properly instructed the jury on imperfect self-defense.

### A. Proceedings Below

The trial court instructed the jury, in pertinent part, on perfect self-defense as follows: "The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being robbed [underlining added.]" (CALCRIM No. 505.) Defense counsel requested the addition of the underlined portion, which was a bracketed option for CALCRIM No. 505 at the time of trial. The prosecutor acquiesced in this addition.

9

The trial court also instructed the jury on voluntary manslaughter arising from imperfect self-defense under CALCRIM No. 571.  "That instruction states that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant kills because of imperfect self-defense.  It further states that a defendant acts in imperfect self-defense if a defendant (1) actually believes that he or she is in imminent danger of being killed or suffering great bodily injury and (2) actually believes that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable." (*People v. Morales* (2021) 69 Cal.App.5th 978, 995 (*Morales*).)  As instructed, CALCRIM No. 571 stated in pertinent part:  "The defendant acted in imperfect self-defense if:  [¶]  The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury[.]"  Unlike CALCRIM No. 505, CALCRIM No. 571 did not contain a bracketed option to include an imminent danger of being robbed as a ground for imperfect self-defense.  Defense counsel did not request that the robbery option be added.

### B.    Standard of Review

"We review a claim of instructional error de novo."  (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.)  "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. [Citation.]  It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues."  (*Barber*, at p. 799.)

10

"[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter," a lesser included offense of murder. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved of on a different ground by *People v. Schuller* (Aug. 17, 2023, S272237) 15 Cal.5th 237, 2023 WL 5281984, at *13 fn. 7 (*Schuller*).) The requirement "to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued." (*Breverman*, at p. 162.)

### C. Analysis

Gaspar argues the trial court was required, on its own motion, to append the phrase from CALCRIM No. 505—"or was in imminent danger of being robbed"—to the end of CALCRIM No. 571 so that it would read: "The defendant acted in imperfect self-defense if: [¶] The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being robbed." Because he was entitled to an instruction that an unreasonable but actual belief in the need to defend against a robbery could reduce murder to voluntary manslaughter, the trial court's failure to so instruct deprived him of the right to present a complete defense and lowered the prosecution's burden of proof.

Relying on *Morales*, *supra*, 69 Cal.App.5th at page 990, the People argue that the robbery language was given in error to

11

Gaspar's jury as a basis for a perfect self-defense instruction, and that error should not be extended to imperfect self-defense. We agree with the People.

On September 30, 2021, approximately eight months before Gaspar's trial began, the First District decided *Morales*. There, the trial court denied the defendant's request to add the bracketed language that an imminent danger of robbery formed a basis for *perfect* self-defense in CALCRIM No. 505 (the underlined language given in this case). (*Morales*, *supra*, 69 Cal.App.5th at pp. 990–992.) On appeal, the court reasoned, "we are not convinced that a mere robbery, without more, will give rise to the right of self-defense with deadly force" since "robberies are not always forcible and atrocious, as they cover a wide scope of conduct." (*Id.* at p. 992.) The *Morales* court observed, for example, that a robbery may be effectuated by the perpetrator politely tapping a person on the shoulder to indicate she should step aside from a cash register. (*Ibid.*, citing *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246.) "A robbery therefore cannot trigger the right to use deadly force in self-defense unless the circumstances of the robbery gave rise to a reasonable belief that the victim would suffer great bodily injury or death."[3] (*Morales*, at p. 992.)

---

[3] In the wake of *Morales* and after Gaspar's trial had concluded, that portion of CALCRIM No. 505 was revised so that it now reads: "The defendant acted in lawful self-defense if: 1. The defendant reasonably believed that he "was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being a victim of (_____<insert inherently forcible and atrocious crime such as rape or mayhem>/<insert noninherently forcible and atrocious crime*

12

By Gaspar's reasoning, the trial court had a *sua sponte* duty to include the robbery language in CALCRIM No. 571 for imperfect self-defense because the trial gave a parallel instruction in CALCRIM No. 505 for perfect self-defense.  At the time of Gaspar's trial, the portion of CALCRIM No. 505 that indicated an imminent danger of being robbed was a basis for perfect self-defense was not an accurate statement of the law. (*Morales, supra,* 69 Cal.App.5th at pp. 990–992.)  We thus reject Gaspar's argument that we should extend this inaccurate statement of the law to CALCRIM No. 571.  (See Pen. Code, § 1127 [judge must refuse to give an incorrect instruction].)

### DISPOSITION

The judgment is affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

KIM, J.

---

*such as robbery>* under circumstances in which (he/she) reasonably believed that (he/she) would suffer great bodily injury or death)]."

13