[Crim. No. 39123. Second Dist., Div. Five. Dec. 29, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MUHAREM KURBEGOVIC, Defendant and Appellant.

732

## COUNSEL

Joseph F. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

YOUNGER, J.*—Muharem Kurbegovic, the self-proclaimed "Alphabet Bomber," was convicted of twenty-five felonies, including seven arsons, three murders and eight charges based on injuries resulting from the bombing of Los Angeles International Airport. We affirm the judgment.

### I

### THE FACTS

A. *The Crimes*

As the facts of the crimes are neither in dispute nor important to the issues raised in this appeal, a brief summary of them will suffice.

---

*Assigned by the Chairperson of the Judicial Council.

In the early morning hours of November 9, 1973, three residences were burned by an arsonist. Their owners were Allan G. Campbell, a municipal court judge,[1] and Marguerite Justice and Emmet McGaughey, two members of the Los Angeles Police Commission.[2] It took only 19 minutes to drive from house to house, so it was possible for one person to have set all three fires.

Seven months later, an arson device was placed in the gas tank of Commissioner McGaughey's car, and he received two strange telephone calls. In the first, the person on the other end made sounds of heavy breathing, without saying anything, but in the second, a male caller said he was from the S.L.A.[3] and that the date for Mr. McGaughey's execution was set within 30 days.

On June 16, 1974, nine postcards, each with a small metal disc under the stamp, got caught in the cancelling machine in the Palm Springs Post Office. The postcards were addressed to the justices of the United States Supreme Court, and each bore a picture of Bob Hope on one side of the card and his signature on the other.

On July 4, 1974, fires were set using gasoline at three apartment buildings in Santa Monica and Marina del Rey. KFWB, an all-news radio station, received a telephone call from a man identifying himself as Isaiak Rasim, a "field commander in the Symbionese Liberation Army," stating that in celebration of the Fourth of July and recognition of the S.L.A., he had set the three fires by means of "bombs."

---

[1] Two years earlier, Judge Campbell had presided over a misdemeanor criminal trial at which appellant was charged with masturbating in a public restroom. The jury acquitted Kurbegovic, but after the trial, the judge stated, "In my opinion you have purposefully, consistently taken advantage of every possible opportunity to turn this trial into a vehicle of your play-acting and pantomiming and for your taking advantage of every possible trick in the book."

[2] In May of 1972, the appellant had appeared before the Los Angeles Police Commission for a permit to open an entertainment establishment. He was questioned about the above arrest and the nature of his intended business. He informed the commission that it was a taxi dance place where a customer "could pay a fee and get anything you want [from a woman]." At the conclusion of the hearing, Commissioner McGaughey made a motion to deny the permit, and Commissioner Justice seconded the motion. Appellant's petition for a permit was thereupon denied.

[3] "S.L.A." would, at that time, have been generally understood to refer to the "Symbionese Liberation Army." While actually a small group of criminally active individuals claiming to espouse politically radical causes, the S.L.A.'s size and scope was a mystery to the public in 1974. It was a ruthless and feared group, responsible for the murder of a school superintendent (see *People* v. *Remiro* (1979) 89 Cal.App.3d 809 [153 Cal.Rptr. 89, 2 A.L.R.3d 1135], cert. den. (1979) 444 U.S. 876 [62 L.Ed.2d 104, 100 S.Ct. 160]) and the February abduction of heiress Patricia Hearst prior to what was only subsequently understood to be its near eradiction in a shootout with police officers in Los Angeles in May. Certainly many feared the group's continued dangerousness in the summer of that year and only the arrest of Miss Hearst (by then a "convert" to the S.L.A. cause) and the remaining members of the group in September of 1975 eradicated those fears. (See *People* v. *Yoshimura* (1979) 91 Cal.App.3d 609 [154 Cal.Rptr. 314].)

The next day, a security guard at the Los Angeles Times found the first of several tapes,[4] to be connected over the coming weeks with appellant, in the planter box in the lobby. It purported to be from Rasim, who now claimed to be "Chief Military Officer" of "Aliens of America" and claimed that deadly nerve gas had been mailed to each Supreme Court justice under a postcard stamp.

On August 6, a bomb exploded in a locker at the Los Angeles International Airport, and shrapnel-like pieces of metal and broken glass showered the terminal, killing three men. A fourth man had his right leg blown off and several other persons suffered injuries. Late that night, Conrad Casler, city editor of the Los Angeles Herald-Examiner, received a telephone call claiming credit for the bombing. The caller identified himself as Rasim and claimed that the bombing was done by "Aliens of America," correctly giving the publicly undisclosed locker number "T 225" as the location of the bomb.

Over the next several days, Mr. Casler received further telephone calls[5] from the same man, who, on each occasion, used the code number "T 225." During these telephone conversations, the caller spoke further of a group he called "Aliens of America." The first bomb, he explained, was placed at the airport because the letter "A" in the word "airport" was the first letter in "Aliens of America."

---

[4]Several lengthy tape-recorded communiques were received at various locations around the city and entered into evidence at trial; their character and content is similar to those quoted hereinbelow and we have no occasion to either quote or even list them all.

[5]One of the calls, typical of the series, was received in evidence at trial:

" 'MR. CASLER: City Desk. This is Casler.

" 'THE CALLER: Hello. This is Esak Rasim (ph), and my code name is T225.

" 'MR. CASLER: Um hum.

" 'THE CALLER: We have placed another one which will go off at—this Sunday in a crowded area, uh.

" 'MR. CASLER: At the airport?

" 'THE CALLER: No, sir. We will not say where it will be, to be, but it, the bomb is 25 pounds, and uh, we will tell you where it is if the charges for murder have been brought against former Los Angeles Police Commissioner Emmet C. McGaughey.

" 'MR. CASLER: Who?

" 'THE CALLER: Emmet C. McGaughey.

" 'MR. CASLER: McGaughey?

" 'THE CALLER: And the charges for murder are brought against present Police Captain George Reynolds Millmore.

" ' . . . . . . . . . . . . . . . . . .

" 'THE CALLER: And they have murdered two Mexican Nationals in skid row apartments in Los Angeles.

" 'MR. CASLER: Um hum.

" 'THE CALLER: And cov, and covered it up as a, as just mistake shooting. We have the evidence which we will bring forward that they have murdered. . .

" 'MR. CASLER: Where can we get the evidence?

" 'THE CALLER: We have it, good night, sir.' "

Another cassette[6] message was found, this time announcing a bomb at the Greyhound Bus depot. The depot was evacuated and police removed one of the largest bombs in the history of Los Angeles from the locker designated by the caller. Casler was again called and told the bomber had chosen the depot because the letter "L" in the word "locker" was the second letter in "Aliens of America." The caller stated that ultimately a series of bombs placed at different locations would spell out "Aliens of America."

## B. *Muharem Kurbegovic*

Appellant was born in 1943 in Sarajevo, Yugoslavia. His mother may have been mentally ill and he claims to have suffered headaches as a child.[7] After

---

[6]The various tapes were similar to one another and often wove the various crimes together. One found next to radio station KPFK in North Hollywood was typical:

" 'This is the voice of Aliens of America, Esak Rasim (ph), Chief Military Officer, speaking. California has a greater percentage of aliens than any other state in the union. Aliens are presently prohibited to influence the political decision making by orderly and peaceful way. Great number of aliens never become United States citizens due to the legal requirements that an alien must be a Christian in order to become citizen. Those who do become citizens can lose such citizenship at any time, thus never acquiring fundamental security of home. Those who are rightfully or wrongfully arrested for any reason never become citizens and, ah, great number of them are deported to the countries they sometimes never knew. We believe that immigration and naturalization laws of this country are great insult to the dignity of this nation, and we believe them to constitute a treason.

" 'In the past we have approached several political leaders and appealed to their moral, religious, and patriotic conscience, but have always been totally ignored. . . . The Aliens of America, which now has an active membership of 11 people is such an organization. During last several years we have been learning tools of guerrilla self-defense, and it is proper that we disclose at this time that it was us who placed three sawdust parafin carton boxes at the doors of Police Commissioners Emmet C. McGaughey, Margaret [*sic*] Justice, who according . . . and Margaret [*sic*] Justice, who according to our evidence were actively involved in the planning and organizing of the execution of two of our brothers in skid row apartments, since labeled mistake shootings of two Mexican Nationals. Judge Campbell reaches an orgasm when he sentences an innocent alien. It was us who placed incendiary plastic bottle into the tank of red Lincoln driven by Emmet C. McGaughey and it was us who placed some bottle in the sofa lining in Stratford apartments. . . .

" 'We want you [to] know, however, that we can step down from this insanity anytime you indicate you want us to do so. All you need to do is to convince U.S. Supreme Court to declare the entire body of immigration and naturalization laws unconstitutional, and to convince Congress and Senate to follow up with repeal of such laws. Any possible new immigration and naturalization laws must be in accordance with Constitutional provisions that all men are created equal under the law and that the Bible is not the law of this land. A deportation being the cruelest form of punishment, next to the death penalty, must be outlawed under all circumstances. All sex laws and all other laws directly derived from Bible or any other pornography of human mind must be repealed. . . .' "

[7]Portions of this factual narrative flow, of necessity, from appellant's uncorroborated testimony at the competency hearing and trial and/or hearsay emanating from him in the testimony of other witnesses.

It may be noteworthy that various factors such as (i) mental illness in the family, (ii) childhood maladies and (iii) hearing voices, in reported decisions under Penal Code section 1368, appeared in appellant's recitation of his background. Note the symptomatology in *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485]. The possibility that appellant may have reviewed courts' accounts of mental illness as related to "competency to stand trial"

studying engineering at universities in Europe, he immigrated to Los Angeles in 1967 via Canada.

Between 1967 and 1974, he moved between various engineering jobs as a result of the cyclic nature of high-technology industries. He was mute at work, but was viewed as very bright, an excellent engineer and a personable coworker. He communicated articulately in writing.

In the late 1960's, appellant began telling friends of a plan to become rich by opening a dance hall, but he was denied a business license by the police commission. (See fn. 2, *ante*.)

His employment also was to relate circumstantially to the later crimes of the "Alphabet Bomber": Appellant had worked, for example, at Dynatech Industries and a tank of the type used by that firm became a part of the Greyhound Bus terminal bomb. While at Dynatech, he also learned how to purchase explosive chemicals from Erb and Gray Company by posing as a representative of a customer (he selected Hughes Aircraft). He also had numerous conversations about bomb construction and related matters with at least one coworker, Stephen Smith (see *infra*, p. 748), including one in which Kurbegovic asked how Smith would undertake a scheme to demand $10 million after setting off a bomb, in exchange for not setting off a second.

Various witnesses tied appellant to parts of the bombs from both the airport and Greyhound terminal, and by August 20, 1974, Kurbegovic was a suspect. A surveillance began that followed him to an apartment, ultimately proving to be his own. Later the same day, appellant left with a box in his hand and drove to the Santa Monica beach area where he parked his car. Officer Robert Sauter observed Kurbegovic sitting in his car with papers in his hand and his lips moving. The appellant then returned home.

That evening, Kurbegovic left his apartment and drove to Hollywood, wearing a red wig, glasses and a green coat. He parked his car and walked to a Carl's Jr. restaurant, entering the restroom. After remaining for a few minutes,

---

determinations is speculation, but by no means farfetched, insofar as appellant began doing law library research at least as early as his 1971 misdemeanor trial. Judicial discussions of Messianic delusions can, and could then, be readily located. (See, e.g., *People* v. *Wolfe* (1950) 198 Misc. 695 [103 N.Y.S.2d 479].) Dr. Pendleton, an Atascadero State Hospital staff psychologist, would later testify that appellant complained when psychiatric texts were denied to him. He queried her and others about the appropriateness of given symptoms to schizophrenia. His "research" coincided with his increasingly bizarre behavior felt to be symptomatic of psychosis.

he walked out of the restaurant. Officer Curtis Hagel thereafter went into the restroom and found a tape cassette wrapped in green paper. The officers listened to the tape in the police car and it was very similar to the others described above.[8]

Moments later, appellant returned, ordered a cup of coffee and went into the restroom for a second time. Officer Hagel followed Kurbegovic into the restroom and arrested him.

After his arrest, Kurbegovic never spoke.

Officers then searched appellant's apartment. Detective McCree, a police bomb specialist, smelled the odor of nitrobenzene (the explosive in the Greyhound bomb) as he entered and, inside, located live pipe bombs and explosive materials.

Other items found inside of the apartment included books on arson, explosives and germ and chemical warfare, a gas mask, documents relating to the denial of his business permit, records of his misdemeanor arrest, newspaper articles on the airport bombing, green paper towels, a tape recorder, a document entitled "Alien Manifesto," (which corresponded to the tape recording recovered at the Carl's Jr.), a rental agreement for the apartment with Kurbegovic's name on it, mechanical timers, tubes, wigs and two receipts for the purchase of chemicals from Erb and Gray for Hughes Aircraft.

We are required to review a jury's finding that appellant, a complex, intelligent, frightening and highly disturbed man, was competent to stand trial, and the court's determination that he be allowed to represent himself. Those issues will each be separately addressed; various others are discussed in a fourth section.

While appellant's actual jury trial (as opposed to the competency hearing) is mentioned on occasion hereinbelow, no issue has been raised in this appeal which requires, or would even be illuminated by, a summary of it, beyond the factual presentation, *ante,* taken from both the trial and competency hearing records.

---

[8]While setting forth the entire content of the tape would accomplish little, its final sentences bear on our analysis hereinbelow:

"Please don't misunderstand our latest postponement of atrocities as a weakness. Just keep in mind that political and military significance of it is classified. We do not belong to those who say, 'Give me liberty or death.' We belong to those who say, 'If you scar my liberty, you are dead.'"

# II

## COMPETENCE TO STAND TRIAL

### A. *Competency Hearings*

#### 1. *The Prior Hearings, 1974-1978*

Shortly after his arrest in 1974, the judge scheduled to preside expressed a doubt as to appellant's competency to stand trial, as defined by Penal Code section 1367: "A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

Pursuant to section 1369[9] a jury trial on the competency issue was held and, in January of 1975, the jury determined that appellant was competent to stand trial,[10] but the court granted a judgment notwithstanding the verdict and found appellant not competent. An appeal by the prosecution from the judgment notwithstanding the verdict brought reversal in this court (*People* v. *Kurbegovic* (Cal.App.) but was ultimately dismissed as moot by the Supreme Court, which had granted a hearing. (Noted at 59 Cal.App.3d 381.)

Appellant was returned to the superior court but, in July of 1976, was found not competent to stand trial.

In October of 1976, appellant was once again returned to court certified as competent by the superintendent of Atascadero State Hospital, but this time the jury returned a verdict that appellant was not competent and he was returned to Atascadero.

#### 2. *The 1979-1980 Hearing*

In November of 1978, appellant was returned to court and criminal proceedings reinstated. But the court again declared a doubt concerning appellant's competency to stand trial, so a third competency hearing was commenced in early 1979.

---

[9]All statutory references are to the Penal Code unless otherwise specified.

[10]The phrase "competent to stand trial" is sometimes abbreviated as simply "competent" herein, but should not be confused with the several other legal uses of that word.

This third jury decided that appellant was competent. While his appeal is, of course, from the ultimate judgment of conviction following the trial on the 25 substantive offenses, the focus of appellant's first and most significant contention on appeal is on the finding of competence based on that verdict.

Appellant, who was represented by counsel at the competency hearing, called two witnesses from Atascadero State Hospital, Roger Pittenger and Dr. Linda Pendleton, and his former attorney, Gerald Chaleff.

a. *The Pittenger Testimony*

Mr. Pittenger was program director for the intensive psychiatric program at Atascadero and a licensed psychiatric technician, who first encountered appellant in 1975.

According to Mr. Pittenger, "staffings" in September 1976 and December 1977 had resulted in consensus opinions that appellant was competent. While the clinical director at Atascadero overruled the 1977 conclusion in a letter to the superior court, Pittenger still agreed with the staff.

During 1978, however, Pittenger had observed symptoms of paranoid schizophrenia (inability to tolerate denials of request, threatening and degrading remarks, and increased attention to numerology) and concluded appellant was, by then, incompetent to stand trial. A December 1978 report noted appellant's asserted plan to prove scientifically to the jury that he was the Messiah, and opined that appellant's grandiose legal strategy represented a major problem in appellant's potential for cooperation with defense counsel.

While Pittenger understood appellant's strategy to be contrary to the purpose of a trial, the possibility that appellant was malingering occurred to him, and he thought some symptoms exaggerated. For example, from the time of his admission to Atascadero until shortly before he was first certified competent in 1976, appellant maintained that he was being charged with public masturbation, which Pittenger doubted he really believed.

Mr. Pittenger was aware that the two psychiatrists who had contact with appellant at Atascadero—Drs. Schumann and Estess—were of the opinion that, aside from appellant's mental disorder, there was some feigning or exaggeration of symptoms.

Approximately two years before the 1979 competency proceedings, appellant told Pittenger that if he could convince a jury three or four times[11] that he was

---

[11]This was the theory of the "ping-pong" motion, also discussed, *post,* at page 746. While not conceding that appellant could have gained *release* in this manner, we do not find his idea tactically so absurd (from appellant's rather desperate point of view) as Pittenger did.

incompetent, the charges would have to be dismissed. To Pittenger's knowledge, appellant *never stated to a member of the Atascadero staff before his certification of competency in September 1976 that he was a Savior or Messiah.*

b. *The Pendleton Testimony*

Linda Pendleton, Ph.D., was a staff psychologist for the intensive psychiatric program at Atascadero State Hospital, and, in her opinion, appellant *was* competent to stand trial as of December 1977.

By 1978, however, Dr. Pendleton had concluded that appellant was incompetent because of his belief that he was the Messiah, his belief that his legal strategy should be to convince a jury of that and the very poor quality of his relationship with his attorney.

Dr. Pendleton admitted that a paranoid schizophrenic may be competent to stand trial, and can exaggerate his symptoms and be deceitful. She further testified that it is possible, though rare, for a paranoid schizophrenic to simulate incompetence and to "turn off" faked delusional material to give the impression that medication is stopping the delusions.

While she testified that, in looking for feigning mental illness symptoms, motivation should be examined, Dr. Pendleton knew of no motive for appellant to fake. She could not be shaken by cross-examination in her belief that appellant was not faking, because appellant, to her, seemed so consistent and earnest. She acknowledged that he was highly intelligent and that *she had advised him* that his notion of being the Messiah was a delusion characteristic of someone who is schizophrenic. This latter conversation was when he complained to her of being denied access to textbooks on schizophrenia.

In short, the jury obviously concluded appellant was "using" and manipulating a well-meaning but naive psychologist to the hilt.

During her testimony, Dr. Pendleton was confronted with evidence that supported such a conclusion by the trier of fact. In 1976, for instance, a letter was sent by appellant to Mr. Bozanich, the prosecutor:

" 'Dear Pal:

" 'After this jury finds me incompetent as they will do, no god under the sun can beat my N.G.I. plea.

" 'Savior my ass, best possible way to beat a murder rap is to play a Savior.

" ' "A" is one, "B" is two, "C" is three. But, really:

" ' "A" stands for "ass."

" ' "B" stands for "Bozanich."

" 'And "C" stands for "Chaleff" [his then attorney].

" ' "D" stands for "destiny."

" 'So it is destiny of two of you legal nutheads to kiss my ass.

" 'I wonder if I could apply for enrollment at UCLA Law School.

" 'Whenever a defendant in murder case gives prosecutor convicting evidence, where previously prosecutor didn't have anything but circumstantial evidence, there are only two possibilities:

" 'Defendant is insane or a fisherman. During questioning of [psychiatrist] Coburn you have become a fish.

" 'Keep this note and frame it. It is worth million times your diploma.

" 'Alphabet Bomber.' "

Dr. Pendleton saw the letter[12] as evidence of schizophrenia, rather than evidence that appellant was faking incompetency.

Dr. Pendleton acknowledged she had heard appellant state that he had fooled a prior jury, but did not feel this statement was "necessarily inconsistent" with a diagnosis of chronic paranoid schizophrenia and she testified that she would need "more information" to be able to determine whether it supported competency or incompetency.

Evidence that appellant had feigned muteness at work for years did not alter Dr. Pendleton's opinion on the validity of Kurbegovic's symptoms; she stated she would consider the possibility that she had been fooled only if she became aware of some change in his behavior.

Interestingly, Dr. Pendleton testified that she *never had a serious doubt that appellant understood the nature of the proceedings and the charges against him.*

---

[12]A similar letter, but more respectful and serious in tone, dealt with the same general strategy, and was sent to the trial judge in November of 1978.

c. *The Chaleff Testimony*

Mr. Chaleff testified (pursuant to waiver of the attorney-client privilege) that he represented appellant from shortly after his arrest until March 1977, a period which included his first two competency trials. Appellant had consistently refused to discuss facts relating to the charged offenses, and, at times, claimed to believe he was charged with public masturbation.

In late 1974 Chaleff felt appellant was incompetent to stand trial. Although he later, on occasion, thought appellant was "putting me on," he concluded that appellant, although mentally ill, *believed* he was manipulating everyone.

In Chaleff's last prehearing discussion with appellant, the latter's belief that the purpose of the competency trial was to find him to be the Messiah was more fixed than previously, and, although then aware that he was charged with very serious offenses, he was unable to rationally assist in the preparation of his defense. Chaleff had no doubt that appellant believed he was the Messiah, though at some point appellant mentioned the "ping pong ball thing," according to which, if appellant had enough competency hearings, the system would "lose him" and he would be let go. Chaleff told appellant this was not the case.

d. *Appellant's Testimony*

The appellant also testified. He was aware of the charges against him and was able to briefly outline them, and he was aware that the "obvious purpose of these proceedings" was to determine whether he was competent or incompetent to stand trial. He also indicated that the proceedings had a "special purpose," namely, to determine whether or not he was the "Messiah," and he explained his intent to convince the jury that he was incompetent to stand trial. He explained his method of presenting as much evidence as he could to support his Messiah proposition to the jury as follows:

"Let's assume that I have committed all the crimes that I'm charged with. It's theoretically in my interests not to go to trial.

"And it is theoretically in my interests to do whatever I can to be found incompetent to stand trial.

"Now, the most beautiful way, the smoothest way for that in my circumstances to prove that I'm incompetent to stand trial is to present, come up with some kind of evidence that I'm a Messiah.

"And the more such evidence that I would present that I'm a Messiah, the deeper that a jury would believe that I'm insane and incompetent to stand trial."

In line with this defense, appellant described the sort of attorney he would like representing him:

"I want someone who is willing to and able to cooperate within rational terms and from the standpoint of defense counsel, the rational thing is to prove I am incompetent to stand trial and to do it by the root of proving that I am a Messiah, the most brilliant line of defense in this particular case.

"Now, whether I am Messiah or not is irrevelant.

"And if I am a Messiah, God will force the jury to accept the proposition that I am. If I am not, my legal interests will be perfectly protected."

Appellant saw it as his attorney's job to help him overtly try to prove himself the Messiah, hence, implicitly incompetent, while at the same time protecting his legal rights.

Appellant also testified that, when he had appeared in 1975 in front of Judge Keene, he attempted to portray "the typical insane person" by asking about his dead father and by stating that his head was a hydrogen bomb filled with "heavy water." He did not believe what he told the judge but put on "a big show" so he would be sent back to Atascadero as incompetent.

He explained that, during the three years before his arrest, he played mute at his place of employment but talked elsewhere. He was also mute when he went to see a doctor to inquire about a 4-F Selective Service classification, because he was aware that aliens were subject to the draft.

Appellant explained his attempts to deceive a number of psychiatrists: He told one, for example, that he was charged with public masturbation and that he thought he was talking to Hitler. Appellant did not believe this, but wanted the psychiatrist to believe he was incompetent.

He explained his 1976 "ping-pong" motion (whereby he would be found incompetent and returned to Atascadero, then stop being a Messiah so he would be returned to court, at which time he would again become a Messiah, be found incompetent, etc.). The motion had raised a "due process" claim that if competency could not be determined and if he could prove that he was not a danger to himself or others, he should be released.

Appellant had termed his own writings "crap," and characterized a document entitled "The Holy Word" as "something I wanted others to think I believed in 1976." Most of it was a "put-on," a fact he revealed neither to Chaleff nor to the psychiatrists with whom he spoke in 1976. He admitted he

had said a lot of things in the last four years and it was hard to keep it all straight, but it was the prosecutor's problem, not his, to separate the "wheat" from the "chaff."

e. *The People's Witnesses*

The prosecution called several people who had known and worked with appellant. The first was Keith Nelson, the president of Dynatech Industries, appellant's employer in the late 1960's. He testified appellant had been a good employee and was very bright; after he was laid off, Nelson told him that if there was more work he would like to have him back. Until his arrest, appellant was mute in his contacts with Nelson, but he did not do anything suggesting he was mentally ill, such as claiming to be the Messiah or speaking of a group such as "Aliens of America."

Joseph Durfee, of Wintec Products, hired appellant in 1969. Although appellant was mute, he was quick and was a good engineer, and some of appellant's designs and drawings undoubtedly went into the Apollo program, with which Wintec was involved. Several months before appellant's arrest, Durfee appeared as a witness on appellant's application for citizenship, and spent several hours with him waiting for a hearing. He saw nothing about appellant's behavior on that date which was different from before, and, aside from muteness (which appellant linked to a frightening incident of his mother's with the Yugoslavian secret police), appellant exhibited no mental abnormality prior to his arrest.

Mr. Durfee's wife, Verona, recalled that appellant came to their home on a number of occasions, and she visited him in the county jail in October 1974. Appellant never exhibited signs of mental illness in Mrs. Durfee's presence.

Allan Bell hired Kurbegovic in 1972 for RPM Industries, where he remained until August 1974. Appellant seemed brilliant and appeared to "know his engineering," but did not speak. On one or two occasions, appellant conversed with Bell over the telephone by Morse code. On other occasions, he communicated through notes in a very expressive manner. Bell had never heard of any claims by appellant to be the Messiah, nor had he heard of the "Aliens of America."

Joseph Sampietro worked with and thought highly of appellant at RPM for about one and one-half years ending in August 1974, and never suspected there was anything wrong with his mental health.

Stephen Smith was an employee of McCulloch Corporation and its subsidiary RPM for five or six years, ultimately as manager of engineering, and was appellant's supervisor for about one year before appellant was laid off several days before his arrest.

Smith considered Kurbegovic a friend and they had spent considerable time discussing matters which could later appear significant, but he never questioned appellant's mental health or his grasp of objective reality or heard him claim to be a prophet or Savior.

In their conversations, Smith testified, both were critical of the "involvement of religious beliefs into government," and they theorized that "something very akin to paranoia" probably influenced the followers of "cultish religions."

Smith and appellant discussed the movie "The Sting." When Smith stated to appellant that the most interesting part of the movie was that the audience itself was "conned" by the scenario unfolding on the screen, appellant responded that the movie would not have done well in Yugoslavia, "because everything in Yugoslavia was layer after layer after layer of deception," and that the popularity of the movie in America testified to the naivete of Americans.

On a number of occasions Smith and appellant discussed the subject of a person playing a religious leader in order to make money; they felt that many present and past religious leaders were involved in this activity.

Smith had told appellant of his previous experience in trying to influence a school board on an issue. Although Smith could do very little as an individual, he found that by writing letters claiming to be from a "taxpayers' concerned group" he gained access to newspaper and television publicity.

In October or November 1976, before appellant's second competency trial, Smith met with appellant at the request of the latter's attorney. Appellant, who was, by then, speaking, stated something to the effect that he was godlike or a Savior, and that Smith was his science prophet, according to appellant's "theory of numbers."

What appellant told Smith was entirely different from anything before, but Smith detected a "snickering attitude," and he concluded that appellant did not believe the material he was presenting to Smith, but rather was using him as a "sounding board" to see "if the script would work." Smith relied on his prior experience with appellant in coming to this conclusion.

## B. *Discussion*

### 1. *Legal vs. Mental Health Definitions*

■ The trial court and jury's task in "competency to stand trial" proceedings and insanity plea situations is to weigh the evidence and determine whether a given individual is "competent" and/or "sane" for the law's purposes,[13] not merely to decide whether or not he is "mentally ill"[14] in some sense. Our task, on appeal, is to determine whether the evidence "view[ed] in the light most favorable to the verdict," supports their finding. (*People* v. *Samuel* (1981) 29 Cal.3d 489, 505 [174 Cal.Rptr. 684, 629 P.2d 485].)

### 2. *The Samuel Case*

■ Relying principally on *People* v. *Samuel, supra,* 29 Cal.3d 489, appellant contends in this appeal that there is insufficient evidence to support the jury's verdict that he was competent to stand trial in 1980, notwithstanding that our statutes plainly put the burden of proof on that issue on him. (§ 1369.)

Both parties have articulately argued the implications of *Samuel* on the instant case and we, as they, must discuss it in some detail.

The trial court, in *Samuel,* held a pretrial competency hearing, as in this case, and ". . . [T]he defense presented an impressive array of evidence demonstrating Samuel's present inability either to understand the nature of the proceedings against him or to rationally assist in the preparation and presentation of his defense. [Citations.] In all, five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified on Samuel's behalf. In addition, four psychiatric reports were admitted into evidence. Without exception, each witness and every report concluded that throughout the period during which the declarant observed the defendant, the latter was incompetent to stand trial. In response, the prosecution offered no expert testimony whatever and only two lay witnesses, neither of whom con-

---

[13]Competency to stand trial, the subject of this portion of our opinion should not, of course, be confused with "insanity" pleas under sections 1016 and 1026; see *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]; Annot. (1981) 9 ALR 4th 526. No such plea was made in the instant case, but certainly many of the subissues considered herein are also present in a case involving "insanity." Ennis & Hansen, *Memorandum of Law: Competency to Stand Trial* (1976) 4 J. Psychiatry & L. 491, 494 discusses practical consequences of the distinction between the two concepts.

[14]Probably because psychiatrists, like the rest of us, are captives of the terminology of their upbringing, even many doctors who are called upon to testify in court simply do not—or can not—recognize that "competency" is not the same as "mental health." (See *United States* v. *Adams* (S.D.N.Y. 1969) 297 F.Supp. 596, 598; Schulman, *Determination of Competency—Burial at the Crossroads,* in 2 Law, Psychiatry and the Mentally Disordered Offender (Irvine, edit. 1973) p. 38.)

tradicted any of the defense testimony." (*People* v. *Samuel, supra,* 29 Cal.3d 489, 497-498.)

Justice Mosk, writing for a unanimous[15] court, noted that the jury was not *required* to accept even a unanimity of expert opinion, and that the chief value of expert testimony rests on the material on which it is based and the reasoning leading to its conclusion. Nevertheless, the court stated the "undisputed facts upon which the defense witnesses relied and the reasoning by which they arrived at their conclusions demonstrate[d] the overwhelming strength of defendant's case." (*Samuel, supra,* 29 Cal.3d at p. 498.)

Included in Samuel's symptoms were lying motionless in bed for days, bizarre auditory and visual hallucinations, rolling in and eating feces and an ability to tolerate 100 times the amount of thorazine it would take to incapacitate completely a normal person. The drug tolerance, in particular, tended to prove the defendant was not feigning mental illness.

Significantly, the Supreme Court did *not* find the above history to absolutely *compel* a finding of mental incompetence, but acknowledged that ". . . even this long history of aberrant behavior could be consistent with present competence to stand trial: 'more is required to raise a doubt [about competence] than mere bizarre actions [citation] or bizarre statements [citation] or . . . psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense.' (*People* v. *Laudermilk,* . . . 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228]." (*Samuel, supra,* 29 Cal.3d at p. 500.)

The expert evidence in *Samuel* "focus[ed] specifically on how Samuel's mental infirmities affected his ability to understand the proceedings and to assist his attorney." (*Samuel, supra,* 29 Cal.3d at p. 500.) In the opinion of several experts, the defendant's "verbal blocking," hallucinations and very low I.Q. would seriously impair his ability to assist counsel and he had only a very vague and confused idea as to what the trial was all about and his attorney's function. (*Id.,* at p. 501.)

Against the "impressive body of evidence" produced by the defense, the prosecution offered "lay testimony that scarcely did more than indicate that defendant could walk, talk, and at times, recall and relate past events." (*Samuel, supra,* 29 Cal.3d at p. 503.)

In reaching its conclusion that the verdict was not supported by substantial evidence, the court stated: "Our power to weigh the evidence is of course

---

[15]All justices concurred, at least in the result, on this issue.

limited by due deference to the trier of fact, and we must therefore view the record in the light most favorable to the verdict. [Citations.]" *(Samuel, supra,* 29 Cal.3d at p. 505.) Nevertheless, there was "no real conflict in the testimony" and the court concluded that "the jury could not reasonably reject the persuasive and virtually uncontradicted defense evidence proving Samuel's mental incompetence to stand trial." *(Samuel, supra,* at pp. 505-506.)

### 3. *The Witnesses' Testimony*

In the instant case, however, we confront the case of a very different sort of individual, found competent in less than three hours by a jury which heard a very different sort of evidence from that in *Samuel*.

The appellant presented three witnesses (other than himself). Taking them in reverse order, we can see why the jury could have given little weight to Chaleff's testimony, as he was equivocal on the issue of whether Kurbegovic was malingering or at least "making up" some symptoms. Chaleff plainly had his doubts and those doubts were communicated to the jury.

On turning to Pittenger, it must be noted that the People never did (and do not on appeal) concede his expertise on the competency to stand trial issue. While a licensed technician, he had essentially *no* academic background and the jury, instructed to consider the qualifications of the witnesses (CALJIC No. 2.80), could properly have discounted his testimony due to his lack of "credentials."

More significantly, however, Pittenger was impeached on the issue of appellant's potential for malingering, and could well have been seen by the jury as a victim of his own circular reasoning: He simply could not square an individual's trying to prove nonsense with any conclusion other than incompetency. His own notion that it would not be in Kurbegovic's interest to try to prove himself the Messiah in front of a jury led him to believe that appellant's professed desire to do just that was the equivalent of inability to cooperate with counsel. In fact, the jury was presented with evidence, including the letter to Bozanich from appellant, that such a tactic was exactly what the defendant had in mind—the cynical and completely calculated espousal of the Messiah theory to convince the jury of his incompetence.

The jury could, on the evidence before it, conclude—and its verdict makes it clear that it *did* conclude—that Pittenger was simply fooled.

But, if the evidence permitted the jury to find that Pittenger got cleverly manipulated, it plainly allowed it to find that Dr. Pendleton[16] was massively

[16]Dr. Pendleton, too, had an academic background which the jury could reasonably have found to be modest, relative to the import of the issues on which she opined, and appellant was

taken in—sufficiently to make her testimony completely unpersuasive. Her denial of the significance of evidence such as the letter to Bozanich, for example, encouraged the jury to infer that she had simply made up her mind and that nothing was going to change it.

The record is replete with other evidence that Dr. Pendleton had become an increasingly certain captive of her own earlier diagnoses, to the point of being an *advocate* for Kurbegovic's assertion of incompetency.[17] She seemed unable or unwilling to submit her views on his condition to much reflection. For example, when the court and counsel inquired of her regarding Kurbegovic's potential motives for feigning symptoms, the following occurred:

"THE COURT: Wait a minute. Let me understand: [¶] Are you saying that motivation for faking is an element to consider whether a person is malingering, or is it an element to look closely to determine whether they are malingering?

"THE WITNESS: An element to look closely to determine whether they're malingering.

"Q. BY MR. BOZANICH: Do you know of any motive that the defendant may have to fake incompetency at the present time?

"A. I'm aware of none."

---

well on his journey through the courts before she had completed her formal education. She testified on direct examination:
"Q. Could you state what your qualifications are as a staff psychologist, please? What your background is?
"A. Okay. I have a bachelor's degree in psychology Magne Cum Laude from Whitman College. [¶] I have a master's degree from Colorado State University. [¶] And a doctor of philosophy degree from Colorado State University in psychology, also. [¶] Plus a year clinical internship at Palo Alto V.A. Hospital.
"Q. [W]hen did you complete your Ph.D. program?
"A. In August of 1976.
"Q. What did you do on your thesis, your master's and Ph.D.?
"A. Master's thesis was on a 'relaxation treatment of insomnia.' [¶] And the doctor dissertation was on basically female assertiveness."

[17]The late Dr. Seymour Pollack, a California pioneer in forensic psychiatry repeatedly warned both medical and legal people engaged in sanity or competency determinations of the dangers of expert witnesses' becoming *advocates*:
"The psychiatrist . . . is expected to avoid advocacy. His desire to help the patient, however, may unwittingly lead him into the role of advocate rather than expert witness. Evidence of his assuming an advocacy role may be hidden or obvious. This change in his position from neutral witness to advocate may be sudden or subtle and may develop during any phase of his participation in the trial process." (Pollack, Psychiatric Consultation for the Court (1968) (reprinted and renamed in Manual on Mental Disorder and Legal Insanity, U. of S. C., 1971) at p. 10.)

The jury could have discounted Dr. Pendleton's credibility because of such an apparent lack of sophistication on the most obvious of motivation issues, and her testimony became patently illogical when juxtaposed with her knowledge of letters from appellant in which he had explained his reasons for faking. Against that sort of evidence, the jury obviously found Dr. Pendleton's reliance on such issues as the appellant's "sincerity" extremely damaging, and such a finding is clearly supported by the record.

Judge Light, in summing up the jury's decision, used an analogy to eyewitness testimony to explain what apparently happened to Mr. Pittenger and Dr. Pendleton:

"You know, once the eyewitness says at the prelim, 'That's the guy,' the chances that they are going to change their mind in court are very slim. I think that to a certain extent when it comes to psychiatric judgments up at Atascadero, once a certain assessment has been reached, that to a certain extent, it's fixed and immutable until and unless the subject of the opinion in fact changes. There is no question that Mr. Kurbegovic is aware of his surroundings and knows what's going on here and what the purpose of these proceedings are. So it appears that what the jury has decided is that his 'unwillingness' to cooperate is an act of free will. However misguided and however unwise.

*"It may in fact be, . . . not only an act of free will, but very wise and in no sense misguided."* (Italics added.)

4. *Kurbegovic as a Defendant*

Various other characteristics distinguish the instant case from *Samuel:* Perhaps the most significant is the intellect of the defendant. In *Samuel,* there was abundant evidence of lifelong mental deficiency; here the record is replete with evidence of Kurbegovic's intelligence.[18] All his former acquaintances and, in fact, the doctors themselves, confirm the view one gets from even skimming the 25,000-page record: Appellant was a man of education and great intellectual resources.

We do not, of course, hold that intellect is, in and of itself, the critical factor in differentiating the two cases, but it is one which the jury can logically consider when evaluating whether an individual is trying to deceive it. While Samuel lacked the ability to fool anyone, the record is extraordinarily clear that Kurbegovic was adept at doing just that, such as by feigning muteness in his

---

[18]Appellant attempted to "coach" both Pittenger and Dr. Pendleton during their testimony in front of the jury and he corrected at least one mistake in a factual assumption underlying his lawyer's questioning of a prosecution witness.

workplace for *years,* without one reported slipup, while being able to speak at will.

In *Samuel,* there was evidence that the man's deficiencies were lifelong (or, at the least, traceable to an early childhood injury); here, *no* witness who had known Kurbegovic before his arrest and, presumably, before a need to feign incompetence arose, thought him mentally unsound.

In *Samuel,* there was evidence that massive doses of thorazine were used to treat and control the defendant; here, according to Mr. Pittenger's testimony, appellant had considerable ability to dictate what medication he did and did not receive (such as by complaining of inability to read when medicated).

Finally, Kurbegovic, unlike Samuel, left a trail of evidence suggesting he was not only competent but very capable of manipulating those around him such as by falsely claiming to believe himself a religious leader or a spokesman for a radical group. Putting that trail together with the letter to Bozanich and appellant's own testimony that he fooled at least one judge (Keene) and jury (the second), the jury had a basis to believe appellant had manipulated Dr. Pendleton and Mr. Pittenger and that he was trying to manipulate them. They were confirmed in their view by the appellant's own assertion that the "obvious purpose of these proceedings is to determine whether I am competent or incompetent to stand trial" and his letter to Judge Light just before the competency hearing (admitted in evidence) in which he stressed a desire to be found not competent to go to trial and his ability to cooperate with a *particular* attorney of his choice.

While the jury's verdict, on this record, appears equivalent to a finding that Kurbegovic was consciously malingering, that would not *necessarily* be the only basis for its finding him competent. In what, at first, appears to be a bizarre discussion, a New York court, three decades ago, made the good point that even sincerely believed delusions do not, in all cases, equal incompetency to stand trial. The court pointed to examples, in the modern world, of men claiming divine powers who were not only competent for courtroom purposes but, indeed, highly effective:

"Specifically, Joseph Smith, who claims to have found the Book of Mormon, and . . . [o]thers today, such as Father Divine, entertain similar ideas. Yet this type of individual without arguing as to the truth or falsity of their claims are perfectly competent, and have been found to be able to live in normal society; to show the judgment in business and in their daily life which is consistent with normal behavior however much the majority of individuals differ with them on their status as the Messiah." (*People* v. *Wolfe, supra,* 103 N.Y.S.2d 479, 482.)

 A properly instructed jury, relying on substantial evidence, determined that appellant was competent to stand trial,[19] and we are given no substantial basis for overturning that determination.

## III

### APPELLANT'S COMPETENCE TO WAIVE
### COUNSEL AND REPRESENT HIMSELF

█ The problem with appellant's argument that he should not have been permitted to represent himself is that it implicitly asks us to ignore *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. Popular with and convenient for trial judges or not, *Faretta* is the law of the land, and finds the right of self-representation to be of constitutional proportion.

Appellant makes much of Judge Light's statement, at the conclusion of the competency hearing, when granting his motion to proceed to trial in propria persona, that ". . . you've been found to be competent so the presumption is that you can represent yourself." But this is a completely accurate statement of the law. The judge did not say that the jury's verdict of competence, standing alone, closed the issue; he simply said that there was a *presumption* of the propriety of self-representation, which, in the wake of *Faretta,* there is. "Whether or not a defendant is competent to act as his own lawyer is irrelevant." (*Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221, 227 [141 Cal.Rptr. 884].)

Three significant things should be noted about Judge Light's position in granting appellant the right to proceed in propria persona:

(1) He had just presided over a month-long hearing on Kurbegovic's competence. Significantly, *because of there having been the competency hearing,*

---

[19]Appellant also argues that the court (by then, Judge Nancy B. Watson) should have interrupted his subsequent *trial* to reinstitute competency proceedings (in what would amount to a *fifth* judicial determination of that issue). In midtrial, the appellant filed a "Messiah Plea and Section 1386 [typographical error in the original; while there is a section 1386, plainly 1368 was intended] P.C. Motion," appending, as exhibits, three expert declarations to Kurbegovic's incompetency to stand trial. But those declarations were (i) generally old (or based on old information), (ii) based on each other or evidence already considered and rejected by the jury at the competency hearing and (iii) most significantly, the same sort of material already considered. *People* v. *Melissakis* (1976) 56 Cal.App.3d 52, 62 [128 Cal.Rptr. 122], *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 548 [145 Cal.Rptr. 643] (and cases cited therein) make it clear that the trial court has no obligation to enter upon a reconsideration of competency recently determined at a full hearing unless a change of circumstances or new evidence is involved.

Plainly, appellant had presented the court with neither. The trial court very expressly noted appellant's ability to control his behavior *when he desired to* and to make a wide variety of tactical determinations indicative of considerable competency. The record makes it clear that the trial judge was more convinced, by the time of filing the above mentioned motion, than either she or Judge Light had previously been, of Kurbegovic's competency.

*he knew far more about appellant than judges granting pro. per. status normally know.*

(2) The judge entered upon a colloquy with appellant which included inquiries about Kurbegovic's understanding and the "ground rules" governing pro. per. status. He certainly went farther in terms of honest and accurate advice (e.g., about the problems of working on legal matters in custody) than is required.

(3) He made a clear finding that the appellant was competent to waive his right to counsel and represent himself. While the jury's verdict was doubtless important to his thinking, he didn't simply *rely* on it, he *agreed* with it.[20]

His own agreement that appellant was competent was clearly important to the judge's decision that appellant had to be allowed to proceed pro se, and his review surely satisfied *Westbrook* v. *Arizona* (1966) 384 U.S. 150 [16 L.Ed.2d 429, 86 S.Ct. 1320], to the extent that *Westbrook* survives *Faretta*. Accordingly, we do not confront the situation in which a trial court is asked to rule on whether a defendant may represent himself after a verdict of competency which is sufficiently well-founded to withstand a motion for new trial, but with which the court disagrees subjectively.

Moreover, we do not confront some of the other imaginable situations in which a defendant is competent under section 1368 but, perhaps, not mentally competent to waive counsel,[21] and the only California case on this issue appears to conclude that "competency to waive counsel" is *not* a different and higher standard from "competency to stand trial" (*People* v. *Zatko* (1978) 80 Cal.App.3d 534 [145 Cal.Rptr. 643]).[22]

While *Faretta* (422 U.S. at p. 817 [45 L.Ed.2d at p. 571]) makes it abundantly clear that an individual who has the requisite competence to waive counsel is entitled to no special analysis of whether he had "adequate represen-

---

[20]At the time of the denial of motions for a new trial on the competence issue, Judge Light made it clear that he concurred explicitly with what the jury had said implicitly, i.e., that incompetence had been feigned.

[21]Very little has been written on the relationship between mental competence to stand trial and the right to represent oneself in the medical literature, but what literature there is stresses "appropriate awareness" and "ability to cooperate" in the proceedings. (Felthouse, *Competency to Waive Counsel: A Step Beyond Competency to Stand Trial* 8 (1980) 8 J. Psychiatry & L. 471.)

[22]Situations where a different conclusion would be reached on the two questions can be hypothesized such as the case of an illiterate defendant, or one whose command of English was inadequate for court purposes or one who—though competent—was of such low intelligence as to be unable to handle *any* aspect of self-representation.

tation," we note that Faretta himself was only found to be "literate, competent and understanding." (422 U.S. at p. 835 [45 L.Ed.2d at p. 582].)

In *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773], our Supreme Court analyzed the situation of a man who decided to represent himself in a *capital case,* armed only with having been a trial defendant on previous occasions (out-of-state) and a 10th grade education. *Notwithstanding that the defendant put on neither defense nor argument, the Supreme Court upheld the conviction.*

Compared with these other defendants in the reported cases, Kurbegovic was a model of ability: He had *successfully* defended himself previously on a criminal charge, he had a university education, was very intelligent and had done a great deal of legal research.

Ironically, at the very hearing at which appellant waived counsel, he discussed the *Drew* case ((1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]) by name,[23] and made and argued a bail review motion. Each of these issues would surely have been beyond the competence of Messrs. Faretta, Curry or Teron.

There was no abuse of discretion (*Curry* v. *Superior Court, supra,* 75 Cal.App.3d at p. 227) and no error in permitting appellant to waive counsel and represent himself.

■ Appellant also urges us to hold that the trial court's refusal to appoint "advisory/standby counsel" denied him rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]), notwithstanding his adamant demands to represent himself.

As the term "standby" counsel generally relates to an attorney's being present to step in and represent an individual no longer able to represent himself, and, as appellant handled the entire trial, we are not presented with the issue in this appeal.

"Advisory" counsel, however, generally refers to an attorney who *assists* a litigant representing himself in a variety of ways, and *Faretta, supra,* doesn't address the issue at all, commenting only on "standby" counsel (422 U.S. at

---

[23]He was concerned that the Supreme Court would again change California's standards relating to sanity and that such a change might adversely affect his own situation if an appeal of the competency verdict took too long. He wondered out loud whether he should hurry to trial or take the time to appeal.

p. 834, fn. 46 [45 L.Ed.2d at p. 581]) to assist the court in case it needs to revoke the defendant's pro. per. privileges.

Neither the pre- nor post-*Faretta* cases suggest that the court has any duty to appoint advisory counsel, and *Chaleff* v. *Superior Court* (1977) 69 Cal.App.3d 721 [138 Cal.Rptr. 735][24] catalogues some of the reasons such a status places counsel in an untenable position. The United States Court of Appeals for the Ninth Circuit has recently unequivocally refused to find a "right to both self-representation *and* the assistance of counsel," and has held the rights to counsel and self-representation to be "disjunctive." (*United States* v. *Halbert* (9th Cir. 1981) 640 F.2d 1000, 1009 (and cases cited therein).)

Nevertheless, in light of the fact that *Halbert,* expressly, and *Chaleff,* implicitly, indicate that the appointment of advisory counsel is discretionary with the trial court, are there factors which would have made such an appointment desirable or required by "due process" considerations, even given the obviously enormous economic costs involved in having counsel available for advice during an eight-month trial?

The answer, at least in this case, is patently "no," as appellant's trial strategy was to prove himself the Messiah (or, in the alternative, to convince the jury of his diminished capacity during the presentation of that theory). It is inconceivable that counsel would have aided him to his satisfaction in trying to prove himself the Messiah, and equally inconceivable that appellant would have been satisfied with any lawyer who did not.[25]

The exercise of discretion was appropriate under all the cirumstances presented to the trial court.

## IV

### OTHER ISSUES

#### A. *Alleged Juror Bias*

Several months into the trial, the court read into the record, outside the presence of the jury, a letter from Juror Sheila E. Easley:

" 'Judge Watson,

---

[24]The case ironically and by complete coincidence, dealt with the refusal to so serve by the same attorney who had earlier represented Kurbegovic.

[25]The court was willing to allow Attorney James Epstein to be present in an advisory capacity, but not, pursuant to section 987, to compensate him for such presence.

" 'As a very conscientious and proud American, I feel this letter to be very pertinent. These past two days of humiliation, insult and stereotypical innuendo experienced on this jury has been quite disgusting and distasteful. I have not worked all these years for a betterment in life to be brought down to such a level of ignorance and degradation as this defendant has clearly shown to my race, my pride and my dignity. I thank God that I did not have to experience the injustice and suffering of my forefathers. [The reading of the letter was momentarily interrupted.]

" 'This subjection to the derogatory terminology used by this defendant is not far from a past hell black people have known. It is outrageous.

" 'I appreciate the experience of being on jury duty. It is most educational observing the judicial system of America in progress. I have the utmost respect for the bench and the judicial proceeding, but I feel the subjectation [*sic*] of the last two days is a turn from the level of professionality.

" 'This letter is not intended as a request to be excused. It is a request for a use of better terminology by the defendant if it is within your ruling or jurisdiction to do so.

" 'I am not sure of the right or acceptability of a juror sending correspondence of this nature. I felt it necessary. Yours respectfully, Sheila E. Easley, Juror No. 12.' "

Appellant moved that the court excuse the juror, who was black, without further inquiry, indicating that he had felt her a racist "the moment she ended up in the jury box." The judge noted that appellant had the opportunity to use a peremptory challenge on Ms. Easley, but appellant indicated that he had decided to keep her on the jury panel because of her education.

Inconsistently, however, he maintained that Easley was a "blue eyedrop girl," a phrase he used several times as if it had an obvious meaning. In response to the court's indication of unfamiliarity with the term, appellant seemed to feel that it described a college-educated black woman who had been subjected to liberal ideologies.

The court concluded that the juror should be examined—out of the presence of her fellows—on the issue of her continuing ability to give the defendant a fair trial. Judge Watson was solicitous of the feelings of the juror, attempting to explain that the defendant had been permitted the use of various racial epithets (not normally allowed in the courtroom) because they seemed to be part of the theory of his defense. The juror responded that she had understood that, but that the usages had seemed to go far beyond that purpose in an effort to be insulting

(a point which appellant pretty clearly admitted during several portions of his colloquy with the court on this issue).

Many questions were asked of Ms. Easley by the court and appellant was permitted to question her on voir dire until his questions went into irrelevant matters. Most significantly, the court asked the following:

"My question to you now, what I ask you now to do is to search your mind and your heart and your conscience and ask whether or not you feel that you have been so offended by the defendant's use of this term that you feel that you cannot evaluate the evidence and set aside any resentment or prejudice or bias you may have, or whether you feel that offended or not you can set that aside and that you can and will evaluate the facts solely from the evidence and apply the law as I state the law to you?

"JUROR NO. 12: I feel I can. I mean, it is just that I hadn't heard that terminology just used so much and to that extent. And it was kind of shocking me that this was 1980 and I was hearing so much of it.

"But as far as separating my emotion from the facts and evidence as has been laid forth from the Court now, I have no difficulty there."

Following its other questions of the juror and those by the appellant, the court made express findings, based on the juror's "responses, demeanor, the appearance, the decorum of the juror; that she will lawfully and properly perform her obligations as a juror."

In fact, appellant's only stated objection was to her being an educated person. While this sort of factor may well play a part in the exercise of peremptory challenges, it is not related to cause and, notwithstanding the extensive inquiry of the juror, no other specific explanation of his objection to her continued service was offered.

■ But his failure to articulate his point at trial should not operate to deny defendant review of his claim if, indeed, evidence of potential juror bias was presented. It is relatively easy to understand the bias argument, i.e., that Juror Easley was unduly squeamish about the use of racial epithets and that her feelings might stand in the way of a fair evaluation of the evidence, regardless of appellant's way of expressing it at trial.

The problem of this argument is, however, its misperception of the concept of "prejudice" or bias. They relate to the *pre*judging of situations or evidence, not to a juror's having normal reactions to what she has already heard. While we may properly admonish jurors not to *discuss* certain matters or even not to form conclusions until they enter the jury room, we plainly do not—and could

not—require that they somehow prevent themselves from feeling the impact of what they have heard.

What we *can* realistically demand is that the trial judge conduct searching and skillful voir dire (see *Murphy* v. *Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031]) on such issues, to discover whether a particular juror's ability to fairly evaluate the evidence has been overcome by a particular incident (at or away from the trial).

Judge Watson's handling of this situation was, in all respects, proper and we have reservations as to whether, given the record before her and her findings on the juror's demeanor, she even had the *discretion* to excuse Ms. Easley. (§ 1089; *People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742], cert. den. (1977) 429 U.S. 1077 [50 L.Ed.2d 796, 97 S.Ct. 820].)

## B. *Handling of Jury Inquiry Regarding Malice*

During deliberations, the jury sent the court a note, asking: "Does the law treat 'malice [aforethought]' . . . 'differently just because it is held by a mentally disturbed person? Does it matter as long as it existed? If express malice aforethought can be seen from the evidence, doesn't it necessarily follow that the person was capable of it?'"

It should be noted that the jury had been instructed orally (and permitted to take the instructions into the juryroom) in accordance with CALJIC No. 8.77 (1979 rev.).[26]

---

[26]As given, the instruction read:

"If you find from the evidence that at the time the alleged crimes of murder, charged in Counts X, XI, and XII were committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"If you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder.

"If you have a reasonable doubt (1) whether he was able to form an intention unlawfully to kill a human being, or (2) whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or (3) whether he did act despite that awareness, you cannot find that he harbored express malice aforethought.

"Further, if you have a reasonable doubt (1) whether his acts were done for a base, anti-social purpose, or (2) whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or (3) whether he did act despite that awareness, you cannot find that he harbored implied malice aforethought.

"Furthermore, if you find that as a result of mental illness, mental defect, or any other cause, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

Portions of CALJIC No. 8.77 (1979 rev.) proper to second degree murder were deleted since there was no evidence to support a verdict of second degree murder in this case.

After a discussion with the deputy district attorney and the defendant, the court offered the following instruction, in accordance with its responsibilities under section 1138:

"Good morning, ladies and gentlemen.

"In response to your inquiries the Court will instruct you further. This instruction in its written form will be made available to you during your deliberations. This instruction is in addition to the instructions heretofore given. In no way does this instruction replace or change any previously stated instruction.

"You are to consider all the instructions as a whole and are to regard each in the light of all the others.

"In order to find malice aforethought, each of the following elements must be proved:

"(1) A killing of a human being by an act involving a high degree of probability that it will result in death.

"(2) Such act is done for a base, antisocial purpose by which is meant an awareness of a duty not to commit such act followed by the commission of the forbidden act despite that awareness.

"And (3) Such act is done either with an intent to kill a human being in which event there exists express malice, or with a wanton disregard for human life in which event there exists implied malice. Thus the only difference between express malice aforethought and implied malice aforethought is whether the person has acted with an intent to kill a human being or acted with a wanton disregard for human life.

"As to Counts X, XI and XII you are required to agree unanimously that malice aforethought has been proved before you may find the defendant guilty of murder. But you are not required to agree as to whether such malice aforethought was express malice or implied malice.

"As to Counts IV and XXI which required proof of a specific intent to commit murder, you are required to agree unanimously that express malice aforethought existed because a specific intent to commit murder necessarily means a specific intent to kill a human being.

"*Your initial task is to determine whether the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect or*

*any other cause. If you find such substantially reduced mental capacity existed, it may or may not negate the existence of malice aforethought.*

*"If you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to act with either express or implied malice aforethought, you cannot find him guilty of murder.*

*"However, if you find beyond a reasonable doubt that the defendant did act with malice aforethought even though he also had diminished capacity, you may find him guilty of murder."* (Italics added.)

■ This was an accurate statement of the law in a difficult area, and in no way violative of the letter or spirit of *People* v. *Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], which requires express instruction on the relationship of diminished capacity to the evidence of malice in the case at hand.

This instruction, stressing, as it does, the threshold issue of diminished capacity and the consequent issue of negation of malice, was an accurate treatment of a very complex issue and we have no criticism of it.

## C. *The Motion to Suppress*

During jury selection, appellant moved to suppress ". . . all evidence found in my apartment at 3109 West 6th Street . . . because it was obtained without a court order. . . ." There was neither service on the People nor 10 days' notice, as required by the Penal Code, and the People objected to the untimeliness of the motion. (§ 1538.5.)

The motion was denied due to its untimeliness, but it was reurged at two later points in the trial.

■ Search and seizure motions may be brought during trial only if (1) the opportunity for the motion did not exist prior to trial, or (2) the defendant was not aware of the grounds for the motion. (§ 1538.5, subd. (h).) Here, the issues had been available to appellant for years (thus making the untimeliness totally without excuse). Further, there was no apparent merit to the motion as the "exigent circumstances"[27] provided by appellant's self-advertised explosives possession and expertise might well have justified the search even as against a

---

[27]Note that the tape (*ante,* fn. 8) found just minutes before appellant's arrest threatened further bombing activity. Taking all evidence then available to them together, officers would have had a substantial basis for believing explosives were at the apartment. The earlier tapes had also spoken of on-going bombing and destruction.

proper motion. (*People* v. *Superior Court (Cope)* (1980) 103 Cal.App.3d 186 [162 Cal.Rptr. 667].)

The motion was properly denied each time it was raised.

D. *Admission of Photographs Into Evidence*

■ Appellant contends that the court erred in admitting photographs of the three men killed in the airport bombing, insofar as he "stipulated" to the cause of their deaths. One of the photos depicts a man whose brain was literally blown out of his head; all are, indeed, gruesome.

The trial court limited the number of photographs admitted; the prosecutor had, on his own, limited the number offered. Moreover, appellant's "stipulations" to issues such as cause-of-death were limited, generally offered in sarcastic terms and followed by cross-examination of the medical experts on the issues he now argues were stipulated to. We will not disturb the trial court's exercise of discretion in admitting the subject photographs in the absence of a clear abuse thereof. (*People* v. *Cruz* (1980) 26 Cal.3d 233 [162 Cal.Rptr. 1, 605 P.2d 830].) We find no such abuse here.

The judgment of conviction is affirmed.

Feinerman, P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1983. Kaus, J., did not participate therein.