Filed 6/24/26  P. v. Hernandez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084609 |
| v. | (Super.Ct.No. INF2201751) |
| CINDY GICELA PARRA HERNANDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James S. Hawkins, Judge. Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Cobi Furdek, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Cindy Gicela Parra Hernandez of committing the willful, deliberate, and premeditated murder of her husband.  (Pen. Code, §§ 187, subd. (a), 189,

subd. (a); unlabeled statutory references are to this code.) On appeal, Hernandez challenges the sufficiency of the evidence supporting the premeditation and deliberation findings. We affirm.[1]

## BACKGROUND

Hernandez admitted to law enforcement that early in the morning on August 7, 2022, she shot and killed her husband, Francisco Guevara Lopez.

### I. *The marital relationship*

Hernandez and Lopez married in 2015. In August 2022, the couple lived together with Hernandez's 14-year-old son, Ramon C. About one week before Lopez died, Hernandez's adult daughter overheard an argument between Lopez and Hernandez in which they agreed to divorce.

Lopez spoke with his mother every day. Lopez and Hernandez would frequently fight when they visited Lopez's mother. Lopez's mother twice heard Hernandez threaten Lopez. Hernandez had recently told Lopez that she "would rather see [Lopez] dead than with another woman."

### II. *The extramarital relationship*

Lopez became romantically involved with Barbra J. in September 2021. Lopez and Barbra spent time together every day at Barbra's house.

In October 2021, Hernandez learned of Lopez's affair. After that, Lopez left home and started spending the night at Barbra's house or at his workplace. Lopez told Barbra

---

[1] In a separate order, we summarily deny Hernandez's petition for writ of habeas corpus.

that he stayed overnight at work on nights when he believed that Hernandez or her family members were following or watching him. Hernandez and her family members would sometimes park at his workplace and watch him all day. After Lopez left his home in October, Barbra said that he started carrying around $20,000 cash in his pocket.

On Valentine's Day (or possibly the previous day) in 2022, Lopez and Barbra went out to dinner. Lopez went home afterward. He later returned to Barbra's house crying and upset, and he told Barbra, "'I have to leave [Hernandez], or she will kill me.'" Lopez had new injuries to his face, back, chest, knee, both legs, ribcage, elbow, and arms. Barbra described the injuries as "severe[]." Lopez's face and both legs were bleeding. Barbra wanted Lopez to go to the hospital because she believed that he needed stitches.

Lopez and Hernandez exchanged a series of text messages about the incident. Lopez sent Hernandez numerous photographs and told her that she "'went too far'" with "'what [she] did to [him] with the fucking car.'" Lopez texted: "'My whole fucking body hurts. All the cuts and yet it hurts me more that you did it and didn't give a shit whether you run me over with a car, screwing up my back and my elbow bone.'" He added: "'To get to those fucking outbursts and extremes, you've gone too fucking far. I never thought you were capable of so much and now I realize that you are….'" Hernandez repeatedly apologized, expressed her love for Lopez, and asked Lopez to forgive her and to return home.

Lopez moved in with Barbra for about one month starting in April 2022. After he moved out in May, they continued to see each other every day. Barbra last saw Lopez the day before he died. They were making plans to see each other more frequently.

III.    *The events preceding the shooting*

Lopez, Hernandez, and Ramon were all at home on August 6-7, 2022. According to Ramon, Lopez and Hernandez argued on August 6 from sometime in the afternoon through midnight, when Ramon went to sleep.

Before Ramon fell asleep, he last saw Hernandez and Lopez together in the backyard. Lopez was drinking alcohol and arguing with Hernandez. He screamed and punched things in the backyard. Ramon heard what sounded like gunshots and ran toward the living room, from which he saw Lopez outside with a gun in his left hand and a bottle in his right hand. Ramon went back to his room and fell asleep.

Ramon was later awakened by Lopez banging on his bedroom window. Lopez then drove Ramon around to look for Hernandez, who Lopez said had walked away from him while they were at a convenience store. Lopez and Ramon eventually gave up the search and returned home, where they found Hernandez. Ramon then went back to sleep for at least 30 minutes.

Sometime after 2:00 a.m., Lopez's friend picked up Lopez, and they went to the convenience store to buy beer but learned it was too late. Lopez and his friend then went to Lopez's house, where they picked up a case of beer and drove to the friend's house. Hernandez was already parked in the friend's driveway when Lopez and his friend arrived around 2:40 a.m. Hernandez yelled at Lopez, and Lopez left with Hernandez.

Lopez had a video call with his mother at 2:40 a.m. on August 7, 2022. He appeared to be outside walking on a street near his home, with Hernandez following him. Hernandez was visible behind Lopez, and she appeared upset. She was cussing at him,

4

telling him, "'Fuck you, you son of a bitch.'" She also told him, "'Tell your mother where you go drinking every day.'" Lopez's mother told Lopez to call a friend to pick him up.

IV.  *The shooting*

At 4:00 a.m. on August 7, 2022, Ramon woke up when he heard a single gunshot. He testified that he heard Hernandez crying and immediately rushed to her room. Hernandez appeared to have taken just one step into the room. She appeared "very shocked." Ramon saw Lopez's body on the floor, with a gun "right next to his right hand, as if it had fallen out of his right hand." Hernandez told him that "she was turned around when she heard the bang."

After Ramon rushed into the room, Hernandez called 911. Hernandez told the dispatcher that she had weapons and fought with her husband, who "took the gun away from [her] hand and he shot himself on the forehead." Hernandez told the dispatcher that the gun was in Lopez's hand, and she did not feel comfortable removing it.

The dispatcher asked Hernandez why she had been armed, and Hernandez responded: "I have a gun, I have had problems with him since October. He cheated on me and we've had problems, he left my house, returned, we've had arguments one after another, one after another, and right now he threatened me that he was going to kill himself because I followed him to the ranch with his friend because he goes there every day and right now he came to me, why? Because I went for him. He threatened me that he was going to kill himself. I never, ever, never, never ever thought that he would pull it."

5

The 911 dispatcher transferred the call to the fire department. Hernandez reiterated that her husband shot himself in the head after fighting with her.

V.    *The investigation*

Sheriff's deputies arrived at Hernandez's house while she was on the phone with the fire department. Lopez's dead body was on the floor in the bedroom, with an apparent gunshot wound to his forehead. The body was near a boxspring and mattress that were on the floor. Deputies found $14,130 in cash in Lopez's possession.

There was a nine-millimeter Smith and Wesson handgun under Lopez's right hand. The parties stipulated that the gun was registered to Hernandez. Lopez's mother testified that Lopez was left-handed.

The deputies saw two shell casings: one on the ground near Lopez's right shin and one on top of the bed. Both casings were from a Luger nine-millimeter. Law enforcement found a bullet embedded in the drywall just above the bedroom closet. There was a small speck of blood or human flesh near the bullet hole. Law enforcement also found another possible strike mark near the bedroom door frame.

An expert on bloodstain pattern interpretation analyzed the blood spatter on the comforter and opined that Lopez was not standing when he was shot. The expert opined that it was "more likely that he was kneeled or in a seated position." Lopez could not have been seated on the bed, because there was no void pattern in the blood on the bed. Lopez could have been seated on the floor. The tank top that Hernandez was wearing had "really fine-impact spatter." In order to have such stains, the tank top "had to have

been very close to the point of origin." The expert concluded that the shirt would have been "[c]onservatively 5 feet" from the point of impact.

VI.    *The autopsy*

A forensic pathologist conducted an autopsy of Lopez's body. Lopez was five feet 10 inches tall. He died from a single gunshot to the center of his forehead. There was no soot or stippling around the entry wound. The pathologist opined on that basis that Lopez did not commit suicide and that the gun was fired from at least two feet away. The bullet exited through the back of Lopez's skull. The pathologist examined Lopez's internal head injuries and concluded that the bullet's path through Lopez's brain was "a little bit to the right and a little bit downward."

The parties stipulated that blood drawn from Lopez's femoral artery on August 7, 2022, had an ethyl alcohol content of 0.123 percent and some amount of methamphetamine; those results did not affect the pathologist's conclusion concerning Lopez's cause of death. Drug screening of the vitreous fluid of Lopez's eyeball revealed a higher ethyl alcohol content level, which the pathologist explained meant that at some point before Lopez died his blood alcohol level had reached the higher level.

VII.    *Law enforcement interview of Hernandez*

Homicide investigators with the sheriff's department interviewed Hernandez at the sheriff's station. The interview was conducted in Spanish. An English translation of the interview was admitted into evidence.

Hernandez described the strife in the couple's relationship, which she said began in October 2021 when she discovered that Lopez had sent Barbra a photograph of his

penis. Hernandez said that she loved Lopez "a lot." She said that she kicked him out of the house in October 2021, but he returned two months later. He moved out again in February 2022 because she hit him with a car, but he returned in May 2022. Hernandez explained that in the February incident, Lopez stood in front of her car and refused to move, so she accelerated and struck him with the car. She had expected him to move out of the way.

As to the shooting, Hernandez initially told the investigators that Lopez shot himself, but she did not know exactly what had happened. She said that she was seated on the bed while the couple argued, and she then felt blood splatter on her.

Detectives told Hernandez that the gunshot wound to Lopez's forehead was inconsistent with suicide. A detective also explained that Lopez would not have fallen to the ground holding the gun if he had committed suicide. The detectives further informed Hernandez that law enforcement found two shell casings in the bedroom, which meant that there had been two gunshots.

Hernandez initially insisted that she heard only one gunshot in the bedroom and that the single gunshot prompted her to turn around. But she subsequently revised her description of what happened, admitting that Lopez "couldn't have shot himself" and "nobody else did it." Hernandez said that she and Lopez were arguing in the bedroom. Earlier that night, he had called his mother and told her that the relationship with Hernandez "wasn't going to work anymore." When they started arguing, Lopez grabbed about $14,000 in cash, which amounted to half of the couple's savings. He took the

8

money because he had decided to leave Hernandez. According to Hernandez, every time they fought, Lopez expressed concern about his half of the savings.

Hernandez claimed that she was seated on the bed when she was arguing with Lopez. He then made her stand up in order to challenge her. She was holding a gun, and he was standing right in front of her. Lopez grabbed the hand in which Hernandez held the gun, pointed the gun toward himself, and told Hernandez, "'If you have the balls, pull.'" Hernandez was "[a]lready mad" and pulled the trigger, causing Lopez to fall immediately.

Hernandez said that she fired the gun "[o]ut of impulse, stupidness, or anger, because of everything." She added that she and Lopez "challenged [themselves] too much. It was too much that we always wanted to be, see who was more—see who was more. That's why he challenged me. That's why all of this happened. Because of a fucking challenge." She also said that she "did it because, well, my anger or whatever, that he challenged me." Hernandez also said that she shot Lopez because she "stupidly got blinded" by his challenge. She described the shooting as "a moment of rage, a moment of anger, in the heat of the moment."

After Hernandez admitted that she shot Lopez, she continued to insist that she did not put the gun in his hand after the shooting. But after a detective showed her a photograph of where the gun was found, she admitted that she "put it there" after she called 911 so that it would look like Lopez "did it." She said that there was only one gunshot, but she also claimed that she could not remember whether there was a second gunshot. Hernandez denied firing the gun after she killed Lopez and denied that a gun

9

had previously been fired inside the house. Although she could not remember exactly how the second gunshot was fired, Hernandez said: "The only thing I know is that that's why he challenged me, because I shot one time. That's why he challenged me, then." Asked by a detective whether she "shot once and then [Lopez] challenged you," Hernandez responded, "So that I'd do it with him" and "I think that's what it was." Hernandez agreed with the detective that she would have aimed the first shot in an upward direction. She explained that she would "never shoot down, never going to shoot, my son is there … if I know that my son is in the other room" because she knew that the bullet would "ricochet" if she did that.

A detective told Hernandez that the coroner had found that the bullet travelled downward through Lopez's head. The detective was trying to understand how the bullet could travel in that direction if both Lopez and Hernandez were standing, given that Hernandez is considerably shorter than Lopez, who was five feet 10 inches tall. Although Hernandez maintained that she could not recall exactly what happened, she said: "The explanation that most—that comes to mind, and that no—I don't know if it happened like that. But the explanation is that he kneeled down so that I'd do it. That's the most logical explanation that I can give you." She also said that it was possible that Lopez "bent down before [her] so that [she'd] hit him. Then, that's what [she] did." Hernandez denied that she instructed Lopez to kneel in front of her, and she denied that she had planned to shoot him.

10

Hernandez repeatedly denied that Lopez ever threatened to kill her, and she said that Lopez "never raised a hand on [her], never hit [her], never nothing…. never - never." Hernandez also denied that she ever hit Lopez.

Toward the end of the interview, a detective asked Hernandez for an emergency contact, and she responded: "My husband. No, not true. If he was still here. Dumb joke."

## DISCUSSION

Hernandez argues that there is insufficient evidence to support a finding that she killed Lopez with premeditation and deliberation. We disagree.

"A murder that is premeditated and deliberate is murder of the first degree." (*People v. Jurado* (2006) 38 Cal.4th 72, 118 (*Jurado*); § 189, subd. (a).) "'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" (*Jurado*, at p. 118.) "[T]he reflection necessary to establish premeditation and deliberation is not measured by duration of time: 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides … which are the result of mere unconsidered or rash impulse hastily executed.'" (*People v. Wright* (1985) 39 Cal.3d 576, 593 (*Wright*).)

In determining whether a finding of premeditation and deliberation is adequately supported, we often consider three kinds of evidence—"preexisting motive, planning

11

activity, and manner of killing." (*Jurado, supra,* 38 Cal.4th at pp. 118-119; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) But those guidelines—referred to as the *Anderson* factors—"are descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420; *People v. Rivera* (2019) 7 Cal.5th 306, 324.)

We review the jury's findings of premeditation and deliberation for substantial evidence. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.) "We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*).) If the record contains sufficient evidence to support the jury's findings, we cannot reverse them merely because the record also contains evidence that would support contrary findings. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).) Rather, we must "draw all reasonable inferences in favor of the judgment." (*Cardenas,* at p. 119, fn. 11.) "Matters of credibility of witnesses and the weight of the evidence are ""'the exclusive province'"" of the trier of fact." (*Ibid.*)

Hernandez argues that there is insufficient evidence that she acted with premeditation and deliberation under any of the *Anderson* factors—motive, planning, and manner of killing. We are not persuaded. There was ample evidence concerning all three factors, from which a jury could reasonably conclude that Hernandez acted with both premeditation and deliberation.

The evidence as to manner of killing in particular supports an inference of premeditation and deliberation. Hernandez shot Lopez in the center of the forehead at close range. The jury was free to disbelieve Hernandez's claim that Lopez provoked her. Both the close proximity to the victim and the location of the gunshot wound support a reasonable inference that the killing was premeditated and deliberate. (*People v. Marks* (2003) 31 Cal.4th 197, 230 ["the manner of the killing, a close-range shooting without any provocation … or evidence of struggle, likewise demonstrates premeditation and deliberation"]; *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["the killings by blows to only the head and by a shotgun blast in his wife's face permit the jury to infer that the manner of killing was so particular and exacting that [the] defendant must have killed intentionally according to a preconceived design and for a reason"].)

In addition, the bullet that killed Lopez had a slight downward trajectory, which supports a reasonable inference that the gun was above Lopez's head. Because Lopez was taller than Hernandez, the downward trajectory supports an inference that he was kneeling or crouching when she shot him. That inference is further supported by the blood spatter expert's testimony that Lopez was kneeling or seated on the ground when he was shot. And the inference is also supported by Hernandez's purportedly speculative statements during her interview that the reason for the bullet's downward trajectory might have been that Lopez was kneeling in front of her when she shot him. The jury was free to disbelieve Hernandez's claim that she could not recall what happened and to conclude instead that her purported speculation was an accurate description of the killing. Taken together, the evidence concerning the manner of killing strongly supports a reasonable

13

inference that the killing was premeditated and deliberate. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 956 ["The angle of entry and the downward trajectory of the bullets through [the victim's] body suggest that the position of the gun was somewhere above his head. As [the] defendant was several inches shorter than [the victim], it could be reasonably surmised that [the victim] may have been crouching or kneeling at the time the shots were fired"], abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110.) Our Supreme Court has described such evidence as strongly suggestive of "an execution-style murder" (*Hawkins*, at p. 956), which alone is compelling evidence supporting a jury finding of premeditation and deliberation, regardless of whether there is any evidence of motive and planning (*id.* at p. 957).

The record also contains strong evidence from which a jury could reasonably infer that Hernandez had a preexisting motive to kill Lopez. Lopez was involved in an extramarital romantic relationship with Barbra for nearly one year, and he continued to see her after returning to reside with Hernandez several months before the killing. The day before he died, Lopez made plans to see Barbra more frequently. One week before the killing, Hernandez's adult daughter heard Lopez and Hernandez argue and decide to get divorced. Lopez called his mother less than two hours before he died and told her that the relationship with Hernandez was over. He told Hernandez that he was going to leave, and he had approximately $14,000 cash in his pocket when he died. Hernandez told detectives that the cash represented one-half of the couple's savings, which Lopez had previously taken with him when he moved out of the house. Barbra confirmed that when Lopez left home in October 2021 he carried approximately $20,000 cash with him.

14

And Lopez and Hernandez had argued for hours before she killed him. Given all of that evidence, a jury could reasonably infer that Lopez planned to leave Hernandez for Barbra imminently and that Hernandez was aware of Lopez's plans.

Hernandez had threatened to kill Lopez and had said that she would rather see him dead than with another woman. And he worried that Hernandez would kill him. In fact, a jury could reasonably infer that Hernandez had attempted to kill him months earlier when she hit him with a car. The threat and the incident with the car tend to show that Hernandez was motivated by jealousy to kill Lopez. (See *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1165 ["The evidence of the ongoing affair and impending divorce provided a strong motive for killing the victim"]; *People v. Disa* (2016) 1 Cal.App.5th 654, 666 [motive for killing shown by evidence that the defendant was jealous of the victim's relationship with another]; *People v. Williams* (2018) 23 Cal.App.5th 396, 410 [the defendant's "rage at the collapse of [his] marriage" provided evidence of motive to kill his wife].)

There also was ample evidence of planning. Two shell casings were found in the bedroom. Although Hernandez could not recall firing two gunshots, she adamantly denied that a gun had ever been fired inside the house before and that she fired the second shot after she killed Lopez. She speculated to detectives that she fired one shot before she shot Lopez. From all of that evidence, the jury could reasonably infer that Hernandez fired the gun twice the night that she killed Lopez and that she fired one shot before shooting Lopez. Hernandez thus had time to reflect between firing the first shot and firing the second. (*People v. Streeter* (2012) 54 Cal.4th 205, 244 [the defendant's acts

15

that "occurred in stages" demonstrated premeditation and deliberation]; *People v. Horning* (2004) 34 Cal.4th 871, 902 ["premeditation can occur in a short time"].) "'"The process of premeditation and deliberation does not require any extended period of time."'" (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)

Hernandez's conduct after the killing further supports an inference that she planned to kill Lopez. Ramon heard a gunshot and ran into his mother's bedroom, where he saw Lopez's body on the floor with a gun near his right hand. The jury could reasonably infer from this evidence that Hernandez placed the gun near Lopez's hand immediately after she shot him, contrary to her statement to law enforcement that she did it after calling 911. Hernandez told Ramon that her back was turned when the shot was fired, and she then told the 911 dispatcher and the fire department that Lopez shot himself. Moreover, in describing how she might have fired the first shot, Hernandez explained that she was aware of her son's presence in his bedroom and how the bullet might ricochet and harm him, so she aimed high in order to avoid that. Given how quickly Hernandez staged the scene to conceal that she shot Lopez, the lies that she immediately told to both Ramon and 911 about what happened, and her awareness of Ramon's presence in the house when she fired the first shot, the jury could reasonably infer that Hernandez had a preexisting plan to kill Lopez, which included a preexisting plan to cover it up by making it look like a suicide.

In addition, the evidence showed that Hernandez had time to reflect and deliberate before she killed Lopez. She claimed that she shot Lopez in the head because he challenged her to do so, the challenge enraged her, and she shot him because she was

16

angry.  Thus, Hernandez's own account of the killing supports a reasonable inference that there was more than "adequate" time after the challenge for Hernandez "to have reached the deliberate and premeditated decision to kill" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658), as opposed to a "'mere unconsidered or rash impulse hastily executed'" (*Wright*, *supra*, 39 Cal.3d at p. 593).  Hernandez had at least the same amount of time as the defendant in *San Nicolas*, who saw the victim's reflection in the mirror, turned around, and stabbed her.  (*San Nicolas*, at p. 658.)  The Supreme Court explained that "[t]his brief period between seeing [the victim's] reflection and stabbing her [was] adequate for [the] defendant to have reached the deliberate and premeditated decision to kill" the victim.  (*Ibid.*)

Hernandez's arguments to the contrary are not persuasive.  She contends that her account of the incident demonstrates that the killing was the result of a rash impulse and a spontaneous reaction to Lopez's drunk belligerence and negates any inference that she had a preexisting plan to kill Lopez or that the killing was the result of any reflective thought or consideration.  But the jury was free to believe only certain portions of Hernandez's account (or her various accounts) while disbelieving others.  In general, evaluating credibility and weighing the evidence are the exclusive province of the jury. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119, fn. 11.)  We do not reweigh the evidence or draw inferences contrary to the jury's findings.  (*Ibid.*)  Nor can we reverse the jury's findings merely because the evidence might also support different inferences or contrary findings.  (*Perez*, *supra*, 2 Cal.4th at p. 1124.)

17

Hernandez's reliance on *People v. Boatman* (2013) 221 Cal.App.4th 1253, in which this court found insufficient evidence of premeditation and deliberation, is misplaced. In *Boatman*, there was no evidence of planning and little to no evidence of motive. (*Id.* at pp. 1267-1268.) As we have explained, the record in the present case contains ample evidence of both planning and motive.

For all of the foregoing reasons, we conclude that the jury's finding that Hernandez committed a premeditated and deliberate murder is supported by substantial evidence.[2]

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.

LEE
J.

---

[2] Hernandez argues in her opening brief that the abstract of judgment does not state the amount of actual custody credits that she was awarded. The People respond that the actual custody credits are stated on the portion of the abstract of judgment describing the determinate portion of Hernandez's sentence, and the forms for the determinate and indeterminate portions of the sentence cross-reference each other. The People conclude that Hernandez has failed to show error, and we agree.